SCARINCI HOLLENBECK
1100 VALLEY BROOK AVENUE
P.O. BOX 790
LYNDHURST, NEW JERSEY 07071-0790
Telephone: (201) 896-4100
Attorneys for Plaintiff, Levinson Axelrod, P.A.
Our File No. : 11368.1000

| | |
|---|---|
| LEVINSON AXELROD, P.A. | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION: MIDDLESEX COUNTY |
| Plaintiff, | |
| vs. | DOCKET NO.: _____ |
| EDWARD HEYBURN, and THE LAW OFFICES OF EDWARD HARRINGTON HEYBURN, A PROFESSIONAL CORPORATION | <u>Civil Action</u> |
| | **VERIFIED COMPLAINT** |
| Defendants. | |

Plaintiff, Levinson Axelrod, P.A. ("Levinson Axelrod"), by and through its attorneys, Thomas J. Cafferty, Esq. and Scarinci Hollenbeck, 1100 Valley Brook Avenue, Lyndhurst, New Jersey 07071, by way of Verified Complaint, says:

<b><u>PARTIES</u></b>

1.      Plaintiff Levinson Axelrod, P.A. is a law firm with its principal offices located at Levinson Plaza, 2 Lincoln Highway, Edison, Middlesex County, New Jersey 08818.

2.      Defendant Edward Heyburn ("Heyburn") is an attorney who, upon information and belief, resides at 7 Poplar Run, East Windsor, New Jersey 08520.  Heyburn is a former employee of Plaintiff.

3.      Defendant Law Offices of Edward Harrington Heyburn, a Professional Corporation ("Heyburn Corporation"), is, upon information and belief, a New Jersey corporation

{00523430.DOC}

providing legal services and having its principal offices located at 37 Robbinsville-Allentown Road, Robbinsville, New Jersey 08691.

### FACTS COMMON TO ALL COUNTS

4.      From on or about October 28, 1998 through April 15, 2004, Defendant Heyburn was employed as an attorney by the law firm of Levinson Axelrod.

5.      During the period of his employment with Plaintiff, Defendant Heyburn was privy to certain confidential and proprietary information of Plaintiff including, but not limited to, confidential communications between firm clients and firm attorneys, personal client information and client lists, inner workings of the law firm's business, including the manner in which client conferences were conducted, firm cases were distributed, case loads were maintained and supervised, cases were evaluated by the firm, liability and damages of individual clients were analyzed and assessed, and cases were settled.

6.      On or about April 15, 2004, Defendant Heyburn was terminated from his employment with Plaintiff after it was discovered that Heyburn was preparing to leave the firm and was utilizing Plaintiff's client lists and information to solicit firm clients to leave the firm with Defendant.   Heyburn also encouraged and solicited at least one other employee of Plaintiff's law firm to leave the firm with Defendant.   Heyburn opened his own practice, the Heyburn Corporation.

7.      Some time thereafter, Defendants created a website, "LevinsonAxelrod.net," on which Defendants not only disparage Plaintiff's law firm and its clients, but also through which Defendants reveal confidential attorney-client communications and confidential and proprietary information of Levinson Axelrod.  In addition, Defendants, through the website, are engaging in conduct that involves dishonesty, fraud, deceit and/or misrepresentation. Defendants also

include on the website the statement, "File an ethics complaint against Levinson Axelrod" under a hyper-link to an Attorney Ethics Grievance Form under the heading "File a Complaint against Levinson Axelrod," adding further fuel to Defendants' toxic fire of false innuendos regarding Plaintiff's purported lack of competence and ethics – all of which have been carefully and deliberately crafted to encourage clients to leave Levinson Axelrod and retain Defendants in its stead.

Moreover, on October 29, 2009, Defendants added an audio component to Defendants' website. That audio component presents the voice of Defendant Heyburn, stating the following:

> Hi, this is Ed Heyburn. Welcome to my website Levinson Axelrod the truth behind the lies. This website is dedicated to all the working class people that get stepped on by their rich bosses. I was an attorney at Levinson Axelrod from 1998 to 2004. I am using this website as an opportunity to shed some light on some dark areas behind the scenes of Levinson Axelrod. I hope you enjoy and if you have any questions or comments, feel free to send them to me at www.heyburnlaw.com.

8.      Defendants' website, when accessed on or about October 29, 2009, and on numerous days prior thereto, prominently displayed the name "Levinson Axelrod" at the top of the website.  The name "Levinson Axelrod" was then repeated at the bottom of the website.  On October 19, 2009, the copyright symbol "©" and year 2009 appeared before the firm name on the bottom of Defendants' website (i.e. "© 2009 Levinson Axelrod"). The obvious intent was to mislead the viewer into believing that the origin of the website was Plaintiff's law firm.

9.      Defendants' website, however, then proceeds to attack the professionalism of Plaintiff's firm attorneys and disparages the firm's  practices, procedures, attorneys and business to the extent that those reading the material would not, if the material were believed, want to engage the firm or continue having the firm represent them in legal matters:

**Ronald B. Grayzel – Lawyer of the Year? Really?**

Ron Grayzel is perhaps one of the most overrated human beings alive.  While he fronts a professional and sympathetic exterior, he truly is neither.

\*      \*      \*

Ron hated fat people and hated representing them.  I am sure Ron wouldn't stand for someone making anti-semitic remarks about a client, so why was this acceptable?  Why insult clients period?  They put their problems in our hands and look up to us like we have some mysterious power.  The last thing they deserve is our condemnation.

I represented a client from 1999 to 2004 when the matter was tried.  Ron was assigned to oversee me and met with the client on a few occasions.  Ron had little to do with the day to day handling of the case but wanted status updates.  I always knew when he wanted the update.  He said, "So what's going on with your fat slob."  Interestingly when I tried the matter, the jury returned a verdict of $1.4 Million with interest.  The case went up on appeal and I started my own office.  There was a battle for who would handle the case thereafter.  The client told me he met with Ron and believed that "Levinson Axelrod" had the big guns to handle the case on appeal.

I didn't have the heart to tell the client that the man he put his trust in called him a big fat slob for the past 5 years.

\*      \*      \*

When I looked at the paperwork it was clear that Ron had overcharged him $17,000.  It is one thing to insult someone but to overcharge them too?

\*      \*      \*

Adam [Rothenberg] didn't have friends because he was a complete asshole.  He was disliked by Levinson Axelrod, his adversaries and Judges alike.

\*      \*      \*

One year my [Hebyburn's] wife had a friend that was in law school.  Adam was in charge of hiring the interns.  I thought this would be a perfect opportunity to call in a favor.  Adam dismissed her and told me that interns were hired based on their connections.  So if your dad worked for a union that referred business then you got the job.  Lesson learned.  The following year, Adam called me and asked if my friend was still interested.  She was and I set up an interview.  When she interviewed, Adam completely dismissed her again.  She came into my office.  It was real awkward.  Adam walked in and then told a sexually inappropriate joke in front of this young girl who was a friend with my wife.  It made me look like a real schmuck.  Afterwards, Adam told me that I should be thankful (to him) for

the fact that he interviewed her (and not the fact that she never had a chance). I haven't spoke to Adam since that day. The world was right. He was an asshole and there was no benefit to befriending him.

*     *     *

Back in the day, Nick Scutari, Russ Wojetenko, Dave Notti and Scott ? worked for us. They were each good attorneys in their own right but Adam called them the "Cancer." He was dead set on turning the partners against them every moment he could. Each one left the firm one by one. It was sad but they are so much better now. Adam rose to become partner but only after being rejected the first time around. He never became the wiser for his efforts.

*     *     *

### David Wheaton-A used car salesman with a law degree

David Wheaton is disliked more inside of the firm than anywhere else. The person that coined the phrase, "Familiarity breeds contempt" had David in mind. I remember a partner telling me a story that epitomized David best. When this partner was a young associate, Wheaton would summon him to his office which was merely feet from the library. Once the associate got to Wheaton's office, he would ask the associate to get him a book from the library. For several years I had little contact with David. I was always warned that if you mentioned you had a good case, David would cherry pick it from you. I wasn't warned that he would dump every one of his shitty cases on you so that he wouldn't lose. It was funny to see his own partners rejoice when he lost a case. Some things were worth more than money to them.

My first experience with Wheaton was when he asked me to help answer interrogatories for one of his clients who was deaf and mute. He assured that the client had a brother who could interpret. Wheaton was infamous for leaving out crucial details. Here, the client wasn't the client. It was her deaf and mute husband. Both the client and the husband signed only Polish sign language. It was a nightmare getting the information from the husband who didn't even witness the accident. When I was done with the assignment, I handed the file back to Wheaton, who refused to take the file back. He reasoned that I had taken the interrogatories and should keep the file. The file was a piece of shit and David had dumped the first of what was dozens of crappy cases on me. The firm kept track of expenses on files. Dumped cases contributed to the expense side of the equation and did not contribute to the revenue side of the equation. So, when he dumped his crap on me, I eventually had to dump the case and it went on my expense list. Then Wheaton had the nerve to complain that my expenses were too high and his was on about 7% of his revenue. No shit.

Later in my career, I had the misfortune of being transferred to his offices and working under him. It is hard to encapsulate the combination of ignorance and arrogance tied together in a pretentious bow. The best example is the character,

Denny Crane on Boston Legal. Wheaton was just like this character, except that he had none of the sympathetic characteristics of William Shatner's character. I was transferred to what we called Levinson South. Richard Levinson and Jim Dunn wanted me to observe and report. They had just forced a partner John Schwarz out of the firm. The fallout was so horrific that John gave up the practice of law. It was an odd time because it seemed that John and David were always close, but I later learned, loyalty was a one way street with Wheaton.

I got down there and found out that I had about 200 cases which is almost double the productive amount. Wheaton was clear to tell me that I could not redistribute any of the cases to his current associates, Julia and Kim who collectively barely had 200 cases. At the first office meeting, Wheaton threw John under the bus by saying that John suffered from depression and that John's wife was a very selfish person. The cases were in a complete and utter disarray and on the cusp of malpractice. John had barely broke $300,000 the year before, well below an expectation for a partner.

*      *      *

So like a good soldier, I reported back to Richard Levinson. The cases were fucked up and I was going to have a fire sale. I worked day and night and settled what could be settled, tried what needed to be tried and dumped all of the garbage I could. What the Edison partners really wanted to know is whether the prospects of Levinson South were really as good as David made it out to be? My honest report was that they were not. Wheaton signed up every case that came into the office without discretion. Bad cases never make money but count as a case until they are dumped or lost. Wheaton didn't care about either of those scenarios. Every case that had the hint of failure would be reassigned to John and later me. John was his scapegoat and I was being groomed to be his successor. Wheaton never understood that there was no benefit to kill a scapegoat. You just need another scapegoat.

Well, needless to say, Wheaton did not appreciate my spying. Despite the chaos, I managed to make $430,000 out of that pile of garbage. The following year I made $650,000 (for them). Each month we had to fill out a settlement sheet listing the cases settled, the costs and other details. This was an additional report that added to the other report that the other partners required. It was due at the end of business on the last day of the month. One month I kicked serious ass and brought in over $200,000 in attorney fees. (Keep in mind that they were paying a yearly salary of $75,000 per year with a possible $50,000 bonus.) I turned in the report at 5:00 p.m. on the 30th of the month. I was sure that he was going to be ecstatic. The 3 other associates had not brought in $200,000 combined that year. He looked at the report and said, "You're a last minute guy." I was shocked! I just handed this idiot a report that said I generated $200,000 of income for him that month and he was upset that I handed it in on time. He got my Irish up that day and I told him, "I am a last minute guy because I am a busting my ass guy

settling case and bringing in $200,000 in fees guy." I left his office because I could not stand that arrogant, silver spoon in the mouth expression on his face.

\*      \*      \*

### Richard Levinson – The Hypocrite Behind the Curtain

\*      \*      \*

Richard hasn't tried a case alone in years-rightfully so.

\*      \*      \*

As a Plaintiff's attorney you always feel that you are fighting for the victim, the downtrodden and the oppressed. We are the ones who quell injustice, not create it. That myth was debunked on afternoon sitting in Richard Levinson's office. Associates would come in and out of partner's offices, waiting patiently to ask a question, get approval or updated them on a project. We had to sit patiently and wait for our turn as the partners talked. We were so unimportant to them, at times they forgot we existed. Many times they would talk about the firm's business right in front of us. I guess these tidbits were our reward for the utter lack of respect they showed us. One day I was sitting in Richard's office waiting for him while he spoke with Richard Marcolous. The topic this day was a female associate, Julia from the Port Monmouth office. In a sad we [sic] we would get joy when another associate fell into disrepute because it increased our chances at reaching the Holy Grail, partnership. Julia was pregnant and Richard and Rich were discussing how to get rid of her without appearing to violate the Law Against Discrimination or Title 9. They were using their knowledge of the law to break the law. I always regret that I did not blow the whistle on them that day. I had a family and two young kids and a promising career. I couldn't chance it for Julia sake. Interestingly, after I left the firm they did fire her. She never reached out to see if I knew anything. I later heard an unconfirmed report that they settled with her for $50,000. It may have seemed good at the time, but if she knew what I knew, she'd agree that it was a short sale. Their actions made me think about their actions to the rest of the discrimination laws. Despite the millions of dollars they made off the African American community, I am not aware of a single African American attorney. I can only remember them hiring two African American secretaries as short term temps.

The debt [sic] of Richard Levinson's callousness was revealed at a time when our Nation was hardest hit and we just started to come together as Americans. It was the afternoon of 9/11. Both Towers had fallen, the Pentagon was hit and a jet crashed in Pennsylvania. Our Edison office was only miles across the Hudson from the World Trade Center. All of the Levinson Axelrod employees had friends and families that worked in New York. We were all desperate to go home and find out if our loved ones made it out or if we were going to have to attend

their funeral. I sat at my desk and listened to the secretaries beg Richard to let the staff go home. He kept saying, "What good would it do?" Here was a man who said he represented the victims of accidents and he lacked the empathy to understand that we needed to go home and hug our family. We needed to go home and grieve in private. I could not believe how heartless a person could be at such a time in our history. I could not believe I was working for such a hypocrite. Interestingly, Ron Grayzel became involved in NJ Lawyer's CARE-a volunteer program to help the victims of 9/11. It was a good opportunity to get his face and the firm in front of the biggest story of our lives. Did they care? They cared alright; they cared about the free publicity. They milk that to this day. Their website still touts Grayzel's 2006 award for *pro bono* lawyer of the year. Really? It is 2009. what have you done lately?

I think the final straw came when Richard called me into his office one morning in late 2003. I had been assigned to the Howell and Forked River Office and then worked under David Wheaton. Wheaton who was not trusted or even like by many inside the firm controlled the Southern Offices. As Wheaton's associate, I was directed to research potential class action cases. I spent a year looking at cases which included the Premerin litigation, the Sulzer's Hip Implant litigation as well as a host of medical implant cases. Finally, one of the partners stumbled upon a case where a lotion manufacturer put a SPF rating on the tube without the approval of the FDA. It was a no brainer. Marcolous, Wheaton and Adam Rothenburg approached me and asked if I would be interested in helping the firm. I said I was as I had said to everything asked of me. The following week, Adam presented the idea at a partners meeting. As Richard Levinson later told me, the idea went over like a led balloon. Now I was summoned into Richard's office in an angry voice. He said, "I thought you were a smart guy, but you not so fucking smart." I was taken completely off guard and I had no idea what he was talking about. I had done everything he asked and I don't think I ever said no to him. I said, "I may have done something wrong but please give me some reference because I have no idea what you are talking about." He said, "Who do you think you are telling us that you are going to run a class action department." Apparently, Richard didn't like the idea of class actions and instead of Rothenburg, Marcolous and Wheaton standing up for the project, they made it seem like my idea. Don't get me wrong, I still think it was a good idea, it just couldn't take the credit or blame in this case. Richard told me that class actions were a stupid idea and no one ever made money. (I laughed to myself when I settled a case against Centex Homes for $650,000 years later while on my own.) His screaming went on for about a half hour and only ended to call Wheaton to confront him and make him tell Wheaton who said what. That took all of the wind out of Richard's sail. He said that I can't do anything without the firm's approval. When asked who spoke for the firm…3 partners…4 partners.. He wouldn't answer. He said I would know it when it happened. From time to time I think about all of the advice Richard gave me over the years and how worthless it proved. If I could only have that time back…

10.     Defendants' website also proceeds to imply, incorrectly, that the designation of certain firm members as "Super Lawyers" was not based on merit, but, rather, purchased.  The site states:

> Super Lawyers = Super Scam!
>
> Levinson Axelrod is advertising some of their lawyers as "Super Lawyers." This misleads the public into thinking that the title Super Lawyer has something to do with their achievements.  If [sic] you see from the American Bar Association Article, their claim could not be further from the truth.

11.     The article immediately following Defendants' statements is titled "Super Lawyer Ads Cost Super Big Bucks."  On October 30, 2009, Defendants added to the website, the statement, "Super Lawyer award is a fraud!," under the hyper-link entitled, "Levinson Axelrod – Super Lawyers?"

12.     Defendants' statements create the false impression that an attorney purchases his/her Super Lawyer designation. In fact, the selection process for attorneys to be named as "Super Lawyers" is as follows:

> In selecting attorneys for Super Lawyers, Law & Politics employs a rigorous, multiphase process. Peer nominations and evaluations are combined with third party research. Each candidate is evaluated on 12 indicators of peer recognition and professional achievement. Selections are made on an annual, state-by-state basis.
>
> The objective is to create a credible, comprehensive and diverse listing of outstanding attorneys that can be used as a resource for attorneys and consumers searching for legal counsel. Since Super Lawyers is intended to be used as an aid in the selection of a lawyer, we limit the list to attorneys who can be hired and retained by the public, i.e., lawyers in private practice and Legal Aid attorneys.
>
> The Super Lawyers selection process involves three basic steps: creation of the candidate pool; evaluation of candidates by the research department; and peer evaluation by practice area.

See www.SuperLawyers.com, which includes the above overview of the selection process.

13.   The website also reveals confidential communications between firm clients and firm attorneys by setting forth sufficient facts that make the clients identifiable:

> A perfect example of Wheatonomics was a day a woman called in with a possible case. She was at Home Depot. She had serious back surgery unrelated to her call. While at Home Depot, she and another patron got into a dispute over who was first. The patron shoved the cart right into the woman's back causing pain. The woman was was [sic] at Home Depot with her husband at the time of the incident, wanted to sue Home Depot for the actions of the patron under a misguided duty to protect. Wheaton and I went to lunch and he laid out the facts and was grinning like he just had gold dropped in his lap. I told Wheaton that the case was garbage and I wouldn't handle it. I also told him that if he transferred the case to me, I would drop it that day. After an hour of insistence, Wheaton agreed that he would meet with the lady. Politely explain that it was a difficult to impossible case and we would not represent her.

14.   Defendant Heyburn goes so far as to criticize the physical appearance of various attorneys at Plaintiff's law firm. By way of example, and not limitation, he personally attacks various attorneys of Plaintiff's law firm, stating, "[w]hat is up with all the 1970's porno mustaches?" "Can anyone figure out what happened to Wheaton's neck? He is starting to look like an old woman," and "I have seen Ron time and again. He looks like death." Defendant Heyburn also attacks another attorney at Plaintiff's firm, stating, "Adam Rothenberg - A man without friends."

15.   Defendant Heyburn displays drawings and quotations on his website. For example, the backgrounds of his website have consisted of images of warriors and gods as well as images of a dark and gloomy lake. He has also posted various quotations on his website:

> The individual has always had to struggle to keep from being overwhelmed by the tribe. If you try it, you...

> He who fights with monsters should be careful lest he thereby become a monster. And if thou gaze long into an abyss, the abyss will also gaze into thee.

{00523430.DOC}                                        10

In addition to these postings, Defendant Heyburn also states in an audio clip, that his website is "dedicated to all the working class people that get stepped on by their rich bosses."

16.     Significantly, the website created by Defendants, "LevinsonAxelrod.net," utilizes the name of the law firm and is almost identical to the law firm's own website, "LevinsonAxelrod.com."

**COUNT ONE**
(Cybersquatting)

17.     Plaintiff incorporates by reference the previous paragraphs as if fully set forth herein.

18.     Plaintiff's domain name, "LevinsonAxelrod.com," is distinctive or famous.

19.     Defendants' domain name, "LevinsonAxelrod.net" is confusingly similar to Plaintiff's.

20.     Defendants chose the domain name with the bad faith intent to profit therefrom.

21.     Defendants' actions constitute cybersquatting in violation of, *inter alia*, the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1)(A).

22.     Plaintiff has been and will continue to be irreparably injured, and/or is likely to be irreparably injured, by Defendants' actions.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a.     temporarily enjoining and restraining Defendants from utilizing, posting, operating, or otherwise maintaining the domain name or subdomain of "LevinsonAxelrod" or any name confusingly similar thereto.

b.     preliminarily enjoining and restraining Defendants from utilizing, posting, operating, or otherwise maintaining the domain name or subdomain of "LevinsonAxelrod" or any name confusingly similar thereto.

     c.     permanently enjoining and restraining Defendants from utilizing, posting, operating, or otherwise maintaining the domain name or subdomain of "LevinsonAxelrod" or any name confusingly similar thereto.

     d.     temporarily enjoining and restraining Defendants from revealing confidential and proprietary communications and information including, but not limited to, those relating to confidential communications between firm clients and firm attorneys, personal client information and client lists, inner workings of the law firm's business, including the manner in which client conferences are conducted, firm cases are distributed, case loads are maintained and supervised, cases are evaluated by the firm, liability and damages of individual clients are analyzed and assessed, and cases are settled.

     e.     preliminarily enjoining and restraining Defendants from revealing confidential and proprietary communications and information including, but not limited to, those relating to confidential communications between firm clients and firm attorneys, personal client information and client lists, inner workings of the law firm's business, including the manner in which client conferences are conducted, firm cases are distributed, case loads are maintained and supervised, cases are evaluated by the firm, liability and damages of individual clients are analyzed and assessed, and cases are settled.

     f.     permanently enjoining and restraining Defendants from revealing confidential and proprietary communications and information including, but not limited to, those relating to confidential communications between firm clients and firm attorneys, personal client information and client lists, inner workings of the law firm's business, including the manner in which client conferences are conducted, firm cases are distributed, case loads are maintained and supervised,

cases are evaluated by the firm, liability and damages of individual clients are analyzed and assessed, and cases are settled.

       g.     requiring that Defendants immediately vacate and cede to Plaintiff the domain name "LevinsonAxelrod.net;"

       h.     for compensatory, statutory and other damages;

       i.     for punitive damages;

       j.     for attorneys fees and costs; and

       k.     for such other relief as the Court may deem just and proper.

## COUNT TWO
### (Trademark Infringement-Violation of Lanham Act)

23.     Plaintiff incorporates the previous paragraphs as if fully set forth herein.

24.     The name Levinson Axelrod is used to identify and distinguish the Plaintiff law firm from goods and services of others and other law firms.

25.     The name, or "mark," Levinson Axelrod is a legally protectible mark of Plaintiff.

26.     Defendants' use of the phrase "Levinson Axelrod" to identify their website is likely to create confusion concerning the origin of the website and information, goods and/or services contained or described therein.

27.     Defendants' actions constitute trademark infringement.

28.     Plaintiff has been and will continue to be irreparably injured, and/or is likely to be irreparably injured, by Defendants' actions.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

       a.     temporarily enjoining and restraining Defendants from utilizing, posting, operating, or otherwise maintaining the domain name or subdomain of "LevinsonAxelrod" or any name confusingly similar thereto.

b.      preliminarily enjoining and restraining Defendants from utilizing, posting, operating, or otherwise maintaining the domain name or subdomain of "LevinsonAxelrod" or any name confusingly similar thereto.

c.      permanently enjoining and restraining Defendants from utilizing, posting, operating, or otherwise maintaining the domain name or subdomain of "LevinsonAxelrod" or any name confusingly similar thereto.

d.      temporarily enjoining and restraining Defendants from revealing confidential and proprietary communications and information including, but not limited to, those relating to confidential communications between firm clients and firm attorneys, personal client information and client lists, inner workings of the law firm's business, including the manner in which client conferences are conducted, firm cases are distributed, case loads are maintained and supervised, cases are evaluated by the firm, liability and damages of individual clients are analyzed and assessed, and cases are settled.

e.      preliminarily enjoining and restraining Defendants from revealing confidential and proprietary communications and information including, but not limited to, those relating to confidential communications between firm clients and firm attorneys, personal client information and client lists, inner workings of the law firm's business, including the manner in which client conferences are conducted, firm cases are distributed, case loads are maintained and supervised, cases are evaluated by the firm, liability and damages of individual clients are analyzed and assessed, and cases are settled.

f.      permanently enjoining and restraining Defendants from revealing confidential and proprietary communications and information including, but not limited to, those relating to confidential communications between firm clients and firm attorneys, personal client information

and client lists, inner workings of the law firm's business, including the manner in which client conferences are conducted, firm cases are distributed, case loads are maintained and supervised, cases are evaluated by the firm, liability and damages of individual clients are analyzed and assessed, and cases are settled.

g.   requiring that Defendants immediately vacate and cede to Plaintiff the domain name "LevinsonAxelrod.net;"

h.   for compensatory, statutory and other damages;

i.   for punitive damages;

j.   for attorneys fees and costs; and

k.   for such other relief as the Court may deem just and proper.

## COUNT THREE
(Trademark Violations – N.J.S.A. 56:4-1 *et. seq.*)

29.   Plaintiff incorporates the previous paragraphs as if fully set forth herein.

30.   Defendants, as an attorney at law and a law firm operating as a professional corporation, respectively, each qualify as a merchant, firm and/or corporation.

31.   Defendants have appropriated for their own use the name, brand, trade-mark, reputation and/or goodwill of Plaintiff law firm, the same profession in which Defendants practice.

32.   Plaintiff has suffered a reduction in the value of its name, brand, trade-mark, reputation and/or goodwill as a result of Defendants' actions.

33.   Defendants have violated N.J.S.A. 56:4-1 *et. seq.* and Plaintiff has, as a result thereof, suffered and will continue to suffer irreparable injury.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

      a.     temporarily enjoining and restraining Defendants from utilizing, posting, operating, or otherwise maintaining the domain name or subdomain of "LevinsonAxelrod" or any name confusingly similar thereto.

      b.     preliminarily enjoining and restraining Defendants from utilizing, posting, operating, or otherwise maintaining the domain name or subdomain of "LevinsonAxelrod" or any name confusingly similar thereto.

      c.     permanently enjoining and restraining Defendants from utilizing, posting, operating, or otherwise maintaining the domain name or subdomain of "LevinsonAxelrod" or any name confusingly similar thereto.

      d.     temporarily enjoining and restraining Defendants from revealing confidential and proprietary communications and information including, but not limited to, those relating to confidential communications between firm clients and firm attorneys, personal client information and client lists, inner workings of the law firm's business, including the manner in which client conferences are conducted, firm cases are distributed, case loads are maintained and supervised, cases are evaluated by the firm, liability and damages of individual clients are analyzed and assessed, and cases are settled.

      e.     preliminarily enjoining and restraining Defendants from revealing confidential and proprietary communications and information including, but not limited to, those relating to confidential communications between firm clients and firm attorneys, personal client information and client lists, inner workings of the law firm's business, including the manner in which client conferences are conducted, firm cases are distributed, case loads are maintained and supervised, cases are evaluated by the firm, liability and damages of individual clients are analyzed and assessed, and cases are settled.

f.        permanently enjoining and restraining Defendants from revealing confidential and proprietary communications and information including, but not limited to, those relating to confidential communications between firm clients and firm attorneys, personal client information and client lists, inner workings of the law firm's business, including the manner in which client conferences are conducted, firm cases are distributed, case loads are maintained and supervised, cases are evaluated by the firm, liability and damages of individual clients are analyzed and assessed, and cases are settled.

g.        requiring that Defendants immediately vacate and cede to Plaintiff the domain name "LevinsonAxelrod.net;"

h.        for compensatory, statutory and other damages;

i.        for punitive damages;

j.        for attorneys fees and costs; and

k.        for such other relief as the Court may deem just and proper.

## COUNT FOUR
### (Unfair Competition)

34.       Plaintiff incorporates the previous paragraphs as if fully set forth herein.

35.       Defendants have made false or misleading statements as to their own product or another's as is set forth more fully in Plaintiff's recitation of Facts Common to All Counts, above.

36.       There is actual deception or a tendency to deceive a substantial portion of the intended audience.

37.    The deception is material in that it is likely to influence purchasing decisions of the public (i.e. prospective clients) as to whether to retain Plaintiff's law firm or, as to existing clients, whether to continue retention of the firm.

38.    The advertised goods/services traveled in interstate commerce.

39.    There is a likelihood of injury to Plaintiff in terms of declining business and loss of good will.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a.    temporarily enjoining and restraining Defendants from utilizing, posting, operating, or otherwise maintaining the domain name or subdomain of "LevinsonAxelrod" or any name confusingly similar thereto.

b.    preliminarily enjoining and restraining Defendants from utilizing, posting, operating, or otherwise maintaining the domain name or subdomain of "LevinsonAxelrod" or any name confusingly similar thereto.

c.    permanently enjoining and restraining Defendants from utilizing, posting, operating, or otherwise maintaining the domain name or subdomain of "LevinsonAxelrod" or any name confusingly similar thereto.

d.    temporarily enjoining and restraining Defendants from revealing confidential and proprietary communications and information including, but not limited to, those relating to confidential communications between firm clients and firm attorneys, personal client information and client lists, inner workings of the law firm's business, including the manner in which client conferences are conducted, firm cases are distributed, case loads are maintained and supervised, cases are evaluated by the firm, liability and damages of individual clients are analyzed and assessed, and cases are settled.

e.   preliminarily enjoining and restraining Defendants from revealing confidential and proprietary communications and information including, but not limited to, those relating to confidential communications between firm clients and firm attorneys, personal client information and client lists, inner workings of the law firm's business, including the manner in which client conferences are conducted, firm cases are distributed, case loads are maintained and supervised, cases are evaluated by the firm, liability and damages of individual clients are analyzed and assessed, and cases are settled.

f.   permanently enjoining and restraining Defendants from revealing confidential and proprietary communications and information including, but not limited to, those relating to confidential communications between firm clients and firm attorneys, personal client information and client lists, inner workings of the law firm's business, including the manner in which client conferences are conducted, firm cases are distributed, case loads are maintained and supervised, cases are evaluated by the firm, liability and damages of individual clients are analyzed and assessed, and cases are settled.

g.   requiring that Defendants immediately vacate and cede to Plaintiff the domain name "LevinsonAxelrod.net;"

h.   for compensatory, statutory and other damages;

i.   for punitive damages;

j.   for attorneys fees and costs; and

k.   for such other relief as the Court may deem just and proper.

### COUNT FIVE
(Breach of Duty of Loyalty)

40.   Plaintiff incorporates the previous paragraphs as if fully set forth herein.

41.     As a former employee of Plaintiff, Defendant Heyburn owes a duty of loyalty to Plaintiff.

42.     Defendant Heyburn's duty of loyalty requires, *inter alia*, that Defendant not disclose Plaintiff's confidential and proprietary business information during or after Heyburn's employment has ended and to otherwise abide by the Rules of Professional Conduct, during his tenure of employment and even after that tenure has ended, when he chooses to act or speak about that tenure.

43.     Defendant Heyburn has breached the duty of loyalty to Plaintiff by, *inter alia*, disclosing to the public and/or otherwise utilizing for personal financial gain certain confidential and proprietary information of Plaintiff including, but not limited to, confidential communications between firm clients and firm attorneys, personal client information and client lists, inner workings of the law firm's business, including the manner in which client conferences were conducted, firm cases were distributed, case loads were maintained and supervised, matters were settled, cases were evaluated by the firm, liability and damages of individual clients were analyzed and assessed.

44.     Further, Defendant Heyburn has breached his duty of loyalty to Plaintiff by portraying on his website the Plaintiff's firm, during his tenure, in an inaccurate manner which discredits the Plaintiff's firm and the entire legal profession by using extreme methods in portraying counsel and the legal system in an absurd light, contrary to the Rules of Professional Conduct.

45.     Plaintiff has been and will continue to be irreparably injured, and/or is likely to be irreparably injured, by Defendant's actions.

**WHEREFORE**, Plaintiff demands judgment against Defendant Heyburn as follows:

a.      temporarily enjoining and restraining Defendant from utilizing, posting, operating, or otherwise maintaining the domain name or subdomain of "LevinsonAxelrod" or any name confusingly similar thereto.

b.      preliminarily enjoining and restraining Defendant from utilizing, posting, operating, or otherwise maintaining the domain name or subdomain of "LevinsonAxelrod" or any name confusingly similar thereto.

c.      permanently enjoining and restraining Defendant from utilizing, posting, operating, or otherwise maintaining the domain name or subdomain of "LevinsonAxelrod" or any name confusingly similar thereto.

d.      temporarily enjoining and restraining Defendant from revealing confidential and proprietary communications and information including, but not limited to, those relating to confidential communications between firm clients and firm attorneys, personal client information and client lists, inner workings of the law firm's business, including the manner in which client conferences are conducted, firm cases are distributed, case loads are maintained and supervised, cases are evaluated by the firm, liability and damages of individual clients are analyzed and assessed, and cases are settled.

e.      preliminarily enjoining and restraining Defendant from revealing confidential and proprietary communications and information including, but not limited to, those relating to confidential communications between firm clients and firm attorneys, personal client information and client lists, inner workings of the law firm's business, including the manner in which client conferences are conducted, firm cases are distributed, case loads are maintained and supervised, cases are evaluated by the firm, liability and damages of individual clients are analyzed and assessed, and cases are settled.

f.     permanently enjoining and restraining Defendant from revealing confidential and proprietary communications and information including, but not limited to, those relating to confidential communications between firm clients and firm attorneys, personal client information and client lists, inner workings of the law firm's business, including the manner in which client conferences are conducted, firm cases are distributed, case loads are maintained and supervised, cases are evaluated by the firm, liability and damages of individual clients are analyzed and assessed, and cases are settled.

g.     requiring that Defendant immediately vacate and cede to Plaintiff the domain name "LevinsonAxelrod.net;"

h.     for compensatory, statutory and other damages;

i.     for punitive damages;

j.     for attorneys fees and costs; and

k.     for such other relief as the Court may deem just and proper.


Dated:  November 4, 2009                    SCARINCI HOLLENBECK
                                            Attorneys for Plaintiff

                                            By: _____
                                            THOMAS J. CAFFERTY, ESQ.


## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Thomas J. Cafferty, Esq., is hereby designated as trial counsel.


Dated:  November 4, 2009                    SCARINCI HOLLENBECK
                                            Attorneys for Plaintiff

                                            By: _____
                                            THOMAS J. CAFFERTY, ESQ.


{00523430.DOC}                          22

## **RULE 4:5-1 CERTIFICATION**

Pursuant to the requirements of <u>R.</u> 4:5-1, I certify that the matter in controversy is not the subject of any other Court or Arbitration proceeding, nor is any other Court or Arbitration proceeding contemplated, except that plaintiff reserves its right to amend the Complaint to add a violation of <u>N.J.S.A.</u> 59:3-3 within the time permitted by law.  No other parties should be joined in this action.

Dated: November 4, 2009

By: _____
    THOMAS J. CAFFERTY

## **CERTIFICATION PURSUANT TO R. 1:38-7(b)**

The undersigned certifies that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

SCARINCI HOLLENBECK
Attorneys for Plaintiff

By: _____
    THOMAS J. CAFFERTY, ESQ.

Dated: November 4, 2009

## VERIFICATION OF PLEADING BY CERTIFICATION

Ronald B. Grayzel, of full age, hereby certifies as follows:

1.     I am a member of the Plaintiff, Levinson Axelrod, P.A. in the above-captioned matter.

2.     I have read the foregoing Verified Complaint and on my personal knowledge, I know that the facts set forth therein are true and accurate, and they are incorporated in this certification by reference.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

RONALD B. GRAYZEL

Dated: November 4, _____, 2009

{00523430.DOC}                                        24