| | |
|---|---|
| LEVINSON AXELROD, P.A.<br><br>                Plaintiff,<br>vs.<br><br>EDWARD HEYBURN, and THE LAW OFFICES OF EDWARD HARRINGTON HEYBURN, A PROFESSIONAL CORPORATION<br><br>                Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION: MIDDLESEX COUNTY<br>DOCKET NO.: _____<br><br>Civil Action |

---

## PLAINTIFF'S BRIEF IN SUPPORT OF ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINTS

---

SCARINCI HOLLENBECK
1100 Valley Brook Avenue
P.O. Box 790
Lyndhurst, New Jersey 07071-0790
(201) 896-4100

Attorneys for Plaintiff, Levinson
Axelrod, P.A.

Of Counsel:
    Thomas J. Cafferty, Esq.

On the Brief:
    Thomas J. Cafferty, Esq.
    Nomi I. Lowy, Esq.
    Lauren E. James, Esq.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 3

LEGAL ARGUMENT ..................................................................................................... 13

I.    PLAINTIFF HAS SATISFIED THE CRITERIA FOR THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER ........................................................................................................ 13

    A.    Plaintiff will suffer irreparable harm if the injunction is not issued ............................................................. 14

    B.    Plaintiff has shown a reasonable probability of success on the merits ................................................................. 15

        1.    Cyber-squatting ....................................................... 15

        2.    Trademark Infringement and Unfair Competition under N.J.S.A. 56:4-1 and 15 U.S.C. 1125(a)(1) ..................................................... 21

        3.    Breach of Duty of Loyalty ..................................... 25

    C.    The harm to Plaintiff if the injunction is not issued is greater than the harm to Defendant if the injunction is issued ............................................................. 29

    D.    The interest of public policy supports the issuance of the injunction. ......................................................... 30

Conclusion ...................................................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,
  237 F.3d 198 (3rd Cir. 2000) ..................................................................................23

A.J. Canfield Co. v. Honickman,
  808 F.2d 291 (3rd Cir. 1986) ..................................................................................22

Bull v. LogEtronics, Inc.,
  323 F. Supp. 115 (E.D. Va. 1971) ...........................................................................26

Cooper Distributing Co., Inc. v. Arnco Electronics,
  131 N.J. Super. 52 (App. Div. 1975) ........................................................................21

Crowe v. DeGioia,
  90 N.J. 126 (1982) ...........................................................................................13, 14

Ditri v. Coldwell Banker Residential Affiliates,
  954 F.2d 869 (3rd Cir. 1992) ..................................................................................24

Dranoff-Perlstein Associates v. Sklar,
  967 F.2d 852 (3rd Cir. 1992) ..................................................................................22

FM 103.1, Inc. v. Universal Broadcasting of New York, Inc.,
  929 F.Supp. 187 (D.N.J. 1996) ...............................................................................22

Fox v. Goz (In re Target Indus., Inc.),
  No. 99-43997, 2008 Bankr. LEXIS 2775 (Bankr. D.N.J. Aug. 28, 2008)...............................26

Mayflower Transit, L.L.C. v. Prince,
  314 F. Supp.2d 362 (D.N.J. 2004) ...........................................................................20

Opticians Ass'n v. Indep. Opticians,
  920 F.2d 187 (3rd Cir. 1990) ..............................................................................14, 15

Shields v. Zuccarini,
  254 F.3d 476 (3rd Cir. 2001) ......................................................................... passim

Sun Dial Corp. v. Rideout,
  16 N.J. 252 (1954) ...............................................................................................26

Vidal Sassoon, Inc. v. Bristol-Myers Co.,
  661 F.2d 272 (2nd Cir. 1981).................................................................................25

<u>Virtual Works, Inc. v. Volkswagen of Am., Inc.</u>,
 238 <u>F.3d</u> 264 (4th Cir. 2001) ................................................................15

<u>Vista India v. Raaga, LLC</u>,
 501 <u>F. Supp. 2d</u> 605 (D.N.J. 2007) ...................................................15

<u>Zinn v. Seruga</u>,
 No. 05-cv-3572, 2006 U.S. Dist. LEXIS 51773 (D.N.J. July 28, 2006) ................................25

## STATUTES

15 <u>U.S.C</u>. 1125(a)(1) .......................................................................21, 22

15 <u>U.S.C</u>. 1125(c)(1) ...........................................................................16

15 <u>U.S.C</u>. § 1125(d) ............................................................................16

15 <u>U.S.C</u>. §1125(d)(1)(B)(i) ................................................................18

<u>N.J.S.A.</u> 56:4-1..................................................................................21, 22

## RULES

R.P.C. 1.6 .........................................................................................26, 27

R.P.C. 7.1 .........................................................................................26, 27

R.P.C. 7.2 .........................................................................................26, 27

R.P.C. 8.4 .........................................................................................26, 27

# PRELIMINARY STATEMENT

In a horrendous cyber-assault on Plaintiff Levinson Axelrod's law firm, Defendant, Edward Heyburn, who is an attorney and disgruntled former employee of Plaintiff's firm, and Defendant Edward Harrington Heyburn, P.C., Edward Heyburn's current law practice, have unlawfully utilized the weapons of trademark infringement and cybersquatting in an effort to destroy Plaintiff's business, with the bad faith intent to profit therefrom. Defendants' website, in addition to assaulting Plaintiff's firm, publicizes and promotes Defendant Heyburn's purported qualifications and prowess as an attorney. An audio component of the website directs readers to contact Defendant Heyburn at his law firm with questions and comments when he states, "I hope you enjoy and if you have any questions or comments feel free to send them to me at www.heyburnlaw.com."

Defendants have created a website for which they have deliberately chosen and illegally used the domain name "LevinsonAxelrod.net" -- a name that is virtually identical to that of Plaintiff's domain name, "LevinsonAxelrod.com" -- in an apparent effort to confuse those entering the site into believing they are entering the Levinson Axelrod firm website.

The Levinson Axelrod name, or "mark," is used to identify and distinguish the Plaintiff law firm from goods and services of others and other law firms and is a legally protected mark of Plaintiff, which Defendants have no legal right to use. Nevertheless, Defendants have chosen to hijack Plaintiff's brand name in an attempt to irreparably injure Plaintiff's business.

Through postings on his "LevinsonAxelrod.net" website Defendants reveal confidential attorney-client communications and confidential and proprietary information of the firm. The website attacks the professionalism of firm attorneys, creates the false impression that the firm loses all or most of its cases, misrepresents facts, deceives the viewing public, and disparages the

firm's practices, procedures, attorneys and business to the extent that those viewing the material would not, if the material were believed, want to engage the firm or continue having the firm represent them in legal matters.

Once the goodwill and public trust in Plaintiff's firm are destroyed, no monetary award will make it whole. A preliminary injunction is an appropriate remedy when: (1) the Plaintiff will suffer irreparable harm if the injunction does not issue; (2) the Plaintiff has shown a reasonable probability of success on the merits; (3) the harm to the Plaintiff if the injunction is not issued is greater than the harm to the defendants if the injunction is issued; and (4) the interest of public policy supports the issuance of the injunction.

Unquestionably, as is set forth more fully below, Plaintiff has satisfied the criteria for injunctive relief in this case. Defendants must be stopped immediately and Plaintiff respectfully requests that this Court enjoin Defendants' actions before further irreparable injury is inflicted.

## STATEMENT OF FACTS

Plaintiff Levinson Axelrod, P.A. is a law firm with its principal offices located at Levinson Plaza, 2 Lincoln Highway, Edison, Middlesex County, New Jersey 08818. See Certification of Ronald B. Grayzel, Esq. ("Grayzel Cert."), Paragraph 1. Plaintiff has operated its law firm under the name "Levinson Axelrod, P.A." for approximately 11 years. Grayzel Cert., Paragraph 19. Plaintiff has maintained a website, "LevinsonAxelrod.com," for approximately 11 years as well. Grayzel Cert., Paragraph 16. Plaintiff has spent years promoting, advertising, and building it law practice. Grayzel Cert., Paragraph 19.

Defendant Edward Heyburn is an attorney who, upon information and belief, resides at 7 Poplar Run East Windsor, New Jersey. Grayzel Cert., Paragraph 5. Defendant is a former employee of Plaintiff. Grayzel Cert., Paragraph 2. Defendant Law Offices of Edward Harrington Heyburn, a Professional Corporation ("Heyburn Corporation"), is, upon information and belief, a New Jersey corporation providing legal services and having its principal offices located at 37 Robbinsville-Allentown Road, Robbinsville, NJ 08691. Grayzel Cert., Paragraph 4.

From on or about October 28, 1998 through April 15, 2004, Defendant Heyburn was employed as an attorney by the law firm of Levinson Axelrod. Grayzel Cert., Paragraph 2. During the period of his employment with Plaintiff, Defendant Heyburn was privy to certain confidential and proprietary information of Plaintiff including, but not limited to, confidential communications between firm clients and firm attorneys, personal client information and client lists, inner workings of the law firm's business, including the manner in which client conferences were conducted, firm cases were distributed, case loads were maintained and supervised, cases were evaluated by the firm, liability and damages of individual clients were analyzed and assessed, cases were settled. Grayzel Cert., Paragraph 2.

On or about April 15, 2004, Defendant Heyburn was terminated from his employment with Plaintiff after it was discovered that Defendant was preparing to leave the firm and was utilizing Plaintiff's client lists and information to solicit firm clients to leave the firm with Defendant Heyburn. Grayzel Cert., Paragraph 3. Heyburn also encouraged and solicited at least one other employee of Plaintiff's law firm to leave the firm with Defendant. Grayzel Cert., Paragraph 3.

Some time thereafter, Defendants created a website, "LevinsonAxelrod.net." Grayzel Cert., Paragraph 6. Defendants' website, when accessed on or about October 29, 2009, and on numerous days prior thereto, prominently displayed the name "Levinson Axelrod" at the top of the website. Grayzel Cert., Paragraph 6. The name "Levinson Axelrod" was then repeated at the bottom of the website. Grayzel Cert., Paragraph 6. On October 19, 2009, the copyright symbol "©" and year 2009 appeared before the firm name on the bottom of Defendants' website (i.e. "© 2009 Levinson Axelrod"). Grayzel Cert., Paragraph 6. The obvious result was to mislead the viewer into believing that the origin of the website was Plaintiff's law firm. Grayzel Cert., Paragraph 6.

Defendants' website, however, then proceeds to not only disparage the law firm and its clients, but also reveal confidential attorney-client communications and confidential and proprietary information of the Plaintiff's law firm. Grayzel Cert., Paragraph 7. Defendants also include on the website the statement, "File an ethics complaint against Levinson Axelrod" under a hyper-link to an Attorney Ethics Grievance Form -- adding further fuel to Defendants' toxic fire of false innuendos regarding Plaintiff's purported lack of competence and ethics – all of which have been carefully and deliberately crafted to encourage clients to leave Levinson Axelrod and retain Defendants in its stead. Grayzel Cert., Paragraph 8

Moreover, on October 29, 2009, Defendants added an audio component to Defendants' website. Grayzel Cert., Paragraph 9. That audio component presents the voice of Defendant Heyburn stating the following:

> Hi, this is Ed Heyburn. Welcome to my website Levinson Axelrod the truth behind the lies. This website is dedicated to all the working class people that get stepped on by their rich bosses. I was an attorney at Levinson Axelrod from 1998 to 2004. I am using this website as an opportunity to shed some light on some dark areas behind the scenes of Levinson Axelrod. I hope you enjoy and if you have any questions or comments, feel free to send them to me at www.heyburnlaw.com. Grayzel Cert., Paragraph 9.

Further, a "Google" search of the name "Levinson Axelrod" conducted on November 4, 2009 displays, as the fifth result, the following:

### Levinson Axelrod's New Site | Levinson Axelrod Sucks
**Levinson Axelrod's** Official Site is back up and running. I encourage you to look at their site and judge for yourself. Should a law firm be allowed to ... **levinsonaxelrod**.net/?page_id=124 - Cached - Similar

See Certification of Thomas J. Cafferty, Esq. ("Cafferty Cert."), Paragraph 2, Exhibit A. The language that appears in this search result is derived from the title tag in the source code for the website which is determined, not by Google, but ultimately by the owner/designer of the website, i.e. Defendant Heyburn. See Cafferty Cert, Paragraph 3, Exhibit B, website source code/title tag.

Defendants' website attacks the professionalism of firm attorneys and disparages the firm's practices, procedures, attorneys and business to the extent that those reading the material would not, if the material were believed, want to engage the firm or continue having the firm represent them in legal matters:

**Ronald B. Grayzel – Lawyer of the Year? Really?**

Ron Grayzel is perhaps one of the most overrated human beings alive. While he fronts a professional and sympathetic exterior, he truly is neither.

*     *     *

Ron hated fat people and hated representing them. I am sure Ron wouldn't stand for someone making anti-semitic remarks about a client, so why was this acceptable? Why insult clients period? They put their problems in our hands and look up to us like we have some mysterious power. The last thing they deserve is our condemnation.

I represented a client from 1999 to 2004 when the matter was tried. Ron was assigned to oversee me and met with the client on a few occasions. Ron had little to do with the day to day handling of the case but wanted status updates. I always knew when he wanted the update. He said, "So what's going on with your fat slob." Interestingly when I tried the matter, the jury returned a verdict of $1.4 Million with interest. The case went up on appeal and I started my own office. There was a battle for who would handle the case thereafter. The client told me he met with Ron and believed that "Levinson Axelrod" had the big guns to handle the case on appeal.

I didn't have the heart to tell the client that the man he put his trust in called him a big fat slob for the past 5 years.

*     *     *

When I looked at the paperwork it was clear that Ron had overcharged him $17,000. It is one thing to insult someone but to overcharge them too?

*     *     *

Adam [Rothenberg] didn't have friends because he was a complete asshole. He was disliked by Levinson Axelrod, his adversaries and Judges alike.

*     *     *

One year my [Hebyburn's] wife had a friend that was in law school. Adam was in charge of hiring the interns. I thought this would be a perfect opportunity to call in a favor. Adam dismissed her and told me that interns were hired based on their connections. So if your dad worked for a union that referred business then you got the job. Lesson learned. The following year, Adam called me and asked if my friend was still interested. She was and I set up an interview. When she interviewed, Adam completely dismissed her again. She came into my office. It was real awkward. Adam walked in and then told a sexually inappropriate joke in front of this young girl who was a friend with my wife. It made me look like a real schmuck. Afterwards, Adam told me that I should be thankful (to him) for the fact that he interviewed her (and not the fact that she never had a chance). I haven't spoke to Adam since that day. The world was right. He was an asshole and there was no benefit to befriending him.

*     *     *

Back in the day, Nick Scutari, Russ Wojetenko, Dave Notti and Scott ? worked for us. They were each good attorneys in their own right but Adam called them the "Cancer." He was dead set on turning the partners against them every moment he could. Each one left the firm one by one. It was sad but they are so much better now. Adam rose to become partner but only after being rejected the first time around. He never became the wiser for his efforts.

*   *   *

### David Wheaton-A used car salesman with a law degree

David Wheaton is disliked more inside of the firm than anywhere else. The person that coined the phrase, "Familiarity breeds contempt" had David in mind. I remember a partner telling me a story that epitomized David best. When this partner was a young associate, Wheaton would summon him to his office which was merely feet from the library. Once the associate got to Wheaton's office, he would ask the associate to get him a book from the library. For several years I had little contact with David. I was always warned that if you mentioned you had a good case, David would cherry pick it from you. I wasn't warned that he would dump every one of his shitty cases on you so that he wouldn't lose. It was funny to see his own partners rejoice when he lost a case. Some things were worth more than money to them.

My first experience with Wheaton was when he asked me to help answer interrogatories for one of his clients who was deaf and mute. He assured that the client had a brother who could interpret. Wheaton was infamous for leaving out crucial details. Here, the client wasn't the client. It was her deaf and mute husband. Both the client and the husband signed only Polish sign language. It was a nightmare getting the information from the husband who didn't even witness the accident. When I was done with the assignment, I handed the file back to Wheaton, who refused to take the file back. He reasoned that I had taken the interrogatories and should keep the file. The file was a piece of shit and David had dumped the first of what was dozens of crappy cases on me. The firm kept track of expenses on files. Dumped cases contributed to the expense side of the equation and did not contribute to the revenue side of the equation. So, when he dumped his crap on me, I eventually had to dump the case and it went on my expense list. Then Wheaton had the nerve to complain that my expenses were too high and his was on about 7% of his revenue. No shit.

Later in my career, I had the misfortune of being transferred to his offices and working under him. It is hard to encapsulate the combination of ignorance and arrogance tied together in a pretentious bow. The best example is the character, Denny Crane on Boston Legal. Wheaton was just like this character, except that he had none of the sympathetic characteristics of William Shatner's character. I was transferred to what we called Levinson South. Richard Levinson and Jim Dunn wanted me to observe and report. They had just forced a partner John Schwarz out of the firm. The fallout was so horrific that John gave up the practice of law. It was an odd time because it seemed that John and David were always

close, but I later learned, loyalty was a one way street with Wheaton.

I got down there and found out that I had about 200 cases which is almost double the productive amount. Wheaton was clear to tell me that I could not redistribute any of the cases to his current associates, Julia and Kim who collectively barely had 200 cases. At the first office meeting, Wheaton threw John under the bus by saying that John suffered from depression and that John's wife was a very selfish person. The cases were in a complete and utter disarray and on the cusp of malpractice. John had barely broke $300,000 the year before, well below an expectation for a partner.

*     *     *

So like a good soldier, I reported back to Richard Levinson. The cases were fucked up and I was going to have a fire sale. I worked day and night and settled what could be settled, tried what needed to be tried and dumped all of the garbage I could. What the Edison partners really wanted to know is whether the prospects of Levinson South were really as good as David made it out to be? My honest report was that they were not. Wheaton signed up every case that came into the office without discretion. Bad cases never make money but count as a case until they are dumped or lost. Wheaton didn't care about either of those scenarios. Every case that had the hint of failure would be reassigned to John and later me. John was his scapegoat and I was being groomed to be his successor. Wheaton never understood that there was no benefit to kill a scapegoat. You just need another scapegoat.

Well, needless to say, Wheaton did not appreciate my spying. Despite the chaos, I managed to make $430,000 out of that pile of garbage. The following year I made $650,000 (for them). Each month we had to fill out a settlement sheet listing the cases settled, the costs and other details. This was an additional report that added to the other report that the other partners required. It was due at the end of business on the last day of the month. One month I kicked serious ass and brought in over $200,000 in attorney fees. (Keep in mind that they were paying a yearly salary of $75,000 per year with a possible $50,000 bonus.) I turned in the report at 5:00 p.m. on the 30th of the month. I was sure that he was going to be ecstatic. The 3 other associates had not brought in $200,000 combined that year. He looked at the report and said, "You're a last minute guy." I was shocked! I just handed this idiot a report that said I generated $200,000 of income for him that month and he was upset that I handed it in on time. He got my Irish up that day and I told him, "I am a last minute guy because I am a busting my ass guy settling case and bringing in $200,000 in fees guy." I left his office because I could not stand that arrogant, silver spoon in the mouth expression on his face.

*     *     *

**Richard Levinson – The Hypocrite Behind the Curtain**

*     *     *

Richard hasn't tried a case alone in years-rightfully so.

$$* \quad * \quad *$$

As a Plaintiff's attorney you always feel that you are fighting for the victim, the downtrodden and the oppressed. We are the ones who quell injustice, not create it. That myth was debunked on afternoon sitting in Richard Levinson's office. Associates would come in and out of partner's offices, waiting patiently to ask a question, get approval or updated them on a project. We had to sit patiently and wait for our turn as the partners talked. We were so unimportant to them, at times they forgot we existed. Many times they would talk about the firm's business right in front of us. I guess these tidbits were our reward for the utter lack of respect they showed us. One day I was sitting in Richard's office waiting for him while he spoke with Richard Marcolous. The topic this day was a female associate, Julia from the Port Monmouth office. In a sad we we [sic] would get joy when another associate fell into disrepute because it increased our chances at reaching the Holy Grail, partnership. Julia was pregnant and Richard and Rich were discussing how to get rid of her without appearing to violate the Law Against Discrimination or Title 9. They were using their knowledge of the law to break the law. I always regret that I did not blow the whistle on them on that day. I had a family and two young kids and a promising career. I couldn't chance it for Julia sake. Interestingly, after I left the firm they did fire her. She never reached out to see if I knew anything. I later heard an unconfirmed report that they settled with her for $50,000. It may have seemed good at the time, but if she knew what I knew, she'd agree that it was a short sale. Their actions made me think about their actions to the rest of the discrimination laws. Despite the millions of dollars they made off the African American community, I am not aware of a single African American attorney. I can only remember them hiring two African American secretaries as short term temps.

The debt [sic] of Richard Levinson's callousness was revealed at a time when our Nation was hardest hit and we just started to come together as Americans. It was the afternoon of 9/11. Both Towers had fallen, the Pentagon was hit and a jet crashed in Pennsylvania. Our Edison office was only miles across the Hudson from the World Trade Center. All of the Levinson Axelrod employees had friends and families that worked in New York. We were all desperate to go home and find out if our loved ones made it out or if we were going to have to attend their funeral. I sat at my desk and listened to the secretaries beg Richard to let the staff go home. He kept saying, "What good would it do?" Here was a man who said he represented the victims of accidents and he lacked the empathy to understand that we needed to go home and hug our family. We needed to go home and grieve in private. I could not believe how heartless a person could be at such a time in our history. I could not believe I was working for such a hypocrite. Interestingly, Ron Grayzel became involved in NJ Lawyer's CARE-a volunteer program to help the victims of 9/11. It was a good opportunity to get his face and the firm in front of the biggest story of our lives. Did they care? They cared alright; they cared about the free publicity. They milk that to this day. Their website still touts Grayzel's

2006 award for *pro bono* lawyer of the year. Really? It is 2009. what have you done lately?

I think the final straw came when Richard called me into his office one morning in late 2003. I had been assigned to the Howell and Forked River Office and then worked under David Wheaton. Wheaton who was not trusted or even like by many inside the firm controlled the Southern Offices. As Wheaton's associate, I was directed to research potential class action cases. I spent a year looking at cases which included the Premerin litigation, the Sulzer's Hip Implant litigation as well as a host of medical implant cases. Finally, one of the partners stumbled upon a case where a lotion manufacturer put a SPF rating on the tube without the approval of the FDA. It was a no brainer. Marcolous, Wheaton and Adam Rothenburg approached me and asked if I would be interested in helping the firm. I said I was as I had said to everything asked of me. The following week, Adam presented the idea at a partners meeting. As Richard Levinson later told me, the idea went over like a led balloon. Now I was summoned into Richard's office in an angry voice. He said, "I thought you were a smart guy, but you not so fucking smart." I was taken completely off guard and I had no idea what he was talking about. I had done everything he asked and I don't think I ever said no to him. I said, "I may have done something wrong but please give me some reference because I have no idea what you are talking about." He said, "Who do you think you are telling us that you are going to run a class action department." Apparently, Richard didn't like the idea of class actions and instead of Rothenburg, Marcolous and Wheaton standing up for the project, they made it seem like my idea. Don't get me wrong, I still think it was a good idea, it just couldn't take the credit or blame in this case. Richard told me that class actions were a stupid idea and no one ever made money. (I laughed to myself when I settled a case against Centex Homes for $650,000 years later while on my own.) His screaming went on for about a half hour and only ended to call Wheaton to confront him and make him tell Wheaton who said what. That took all of the wind out of Richard's sail. He said that I can't do anything without the firm's approval. When asked who spoke for the firm…3 partners…4 partners.. He wouldn't answer. He said I would know it when it happened. From time to time I think about all of the advice Richard gave me over the years and how worthless it proved. If I could only have that time back…

Grayzel Cert., Paragraph 11.


The website also reveals confidential communications between firm client[s] and firm attorneys by setting forth sufficient facts that make the client[s] identifiable:

A perfect example of Wheatonomics was a day a woman called in with a possible case. She was at Home Depot. She had serious back surgery unrelated to her call. While at Home Depot, she and another patron got into a dispute over who was first. The patron shoved the cart right into the woman's back causing pain. The woman was was [sic] at Home Depot with her husband at the time of the incident,

wanted to sue Home Depot for the actions of the patron under a misguided duty to protect. Wheaton and I went to lunch and he laid out the facts and was grinning like he just had gold dropped in his lap. I told Wheaton that the case was garbage and I wouldn't handle it. I also told him that if he transferred the case to me, I would drop it that day. After an hour of insistence, Wheaton agreed that he would meet with the lady. Politely explain that it was a difficult to impossible case and we would not represent her.

Grayzel Cert., Paragraph 12.

The website also proceeds to imply incorrectly that the designation of certain firm members as "Super Lawyers," was not based on merit, but rather, purchased. Grayzel Cert., Paragraph 13. The site states:

Super Lawyers = Super Scam!

Levinson Axelrod is advertising some of their lawyers as "Super Lawyers." This misleads the public into thinking that the title Super Lawyer has something to do with their achievements. If [sic] you see from the American Bar Association Article, their claim could not be further from the truth.

Grayzel Cert., Paragraph 13.

The article immediately following Defendants' statements is titled "Super Lawyer Ads Cost Super Big Bucks." Grayzel Cert., Paragraph 13. On October 30, 2009, Defendant added the statement, "Super Lawyer award is a fraud!" under the hyper-link, "Levinson Axelrod - Super Lawyers?" on the website. Grayzel Cert., Paragraph 13. Defendants' statements create the false impression that an attorney purchases his/her Super Lawyer designation. Grayzel Cert., Paragraph 13. In fact, the selection process for attorneys to be named as "Super Lawyers" is as follows:

In selecting attorneys for Super Lawyers, Law & Politics employs a rigorous, multiphase process. Peer nominations and evaluations are combined with third party research. Each candidate is evaluated on 12 indicators of peer recognition and professional achievement. Selections are made on an annual, state-by-state basis.
The objective is to create a credible, comprehensive and diverse listing of outstanding attorneys that can be used as a resource for attorneys and consumers searching for legal counsel. Since Super Lawyers is intended to be used as an aid in the selection of a lawyer, we limit the list to attorneys who can be hired and

retained by the public, i.e., lawyers in private practice and Legal Aid attorneys. The Super Lawyers selection process involves three basic steps: creation of the candidate pool; evaluation of candidates by the research department; and peer evaluation by practice area.

See www.SuperLawyers.com, which includes the above overview of the selection process. Grayzel Cert., Paragraph 13.

Defendant Heyburn goes so far as to criticize the physical appearance of various attorneys at Plaintiff's law firm. See Exhibits to Paragraph 10 of Grayzel Cert. By way of example, and not limitation, he personally attacks various attorneys of Plaintiff's law firm, stating, "[w]hat is up with all the 1970's porno mustaches?" "Can anyone figure out what happened to Wheaton's neck? He is starting to look like an old woman," and "I have seen Ron time and again. He looks like death." See Exhibits to Paragraph 10 of Grayzel Cert. Defendant Heyburn also attacks another attorney at Plaintiff's firm, stating, "Adam Rothenberg - A man without friends." See Exhibits to Paragraph 10 of Grayzel Cert. Defendant Heyburn displays drawings and quotations on his website. Exhibits to Paragraph 10 of Grayzel Cert. For example, the backgrounds of his website have consisted of images of warriors and gods, and a dark and gloomy lake. See Exhibits to Paragraph 10 of Grayzel Cert. He has also posted various quotations on his website:

> The individual has always had to struggle to keep from being overwhelmed by the tribe. If you try it, you...

> He who fights with monsters should be careful lest he thereby become a monster. And if thou gaze long into an abyss, the abyss will also gaze into thee.

> See Exhibits to Paragraph 10 of Grayzel Cert.

In addition to these postings, Defendant Heyburn also states in an audio clip, that his website is "dedicated to all the working class people that get stepped on by their rich bosses." See Exhibits to Paragraph 10 of Grayzel Cert.

As a result of Defendants' unlawful conduct, Plaintiff has instituted this action for (1) Cybersquatting; (2) Trademark Violations/Lanham Act; (3) State Trademark Violations; (4) Unfair Competition; and (5) Breach of Duty of Loyalty.

As Defendants' conduct has caused, and will continue to cause, irreparable injury to Plaintiff, which cannot be adequately addressed by monetary damages, Plaintiff is seeking herein temporary restraints against Defendants.

## LEGAL ARGUMENT

### I.   PLAINTIFF HAS SATISFIED THE CRITERIA FOR THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER

New Jersey has long recognized the use of injunctive relief, such as a temporary restraining order ("TRO"), as a mechanism to "prevent some threatening, irreparable mischief, which should be averted until opportunity is afforded for a full and deliberate investigation of the case." Crowe v. DeGioia, 90 N.J. 126, 132 (1982) (internal citations omitted). In determining whether a TRO is an appropriate remedy, "courts have been guided traditionally by certain fundamental principles." Id. Specifically, a TRO is an appropriate remedy when: (1) the Plaintiff will suffer irreparable harm if the injunction does not issue; (2) the Plaintiff has shown a reasonable probability of success on the merits; (3) the harm to the Plaintiff if the injunction is not issued is greater than the harm to the defendants if the injunction is issued; and (4) the interest of public policy supports the issuance of the injunction. Id. at 132-34.

Application of these principles to the case *sub jucice* leaves no doubt that a temporary restraining order is appropriate and necessary to prevent further irreparable injury "until opportunity is afforded for a full and deliberate investigation of the case." Id. at 132.

## A.   Plaintiff will suffer irreparable harm if the injunction is not issued.

"Harm is generally considered irreparable in equity if it cannot be redressed adequately by monetary damages...Pecuniary damages may be inadequate because of the nature of the injury or of the right affected." Crowe, supra, at 132-33.  "Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will." Opticians Ass'n v. Indep. Opticians, 920 F.2d 187, 195 (3rd Cir. 1990).

There can be no legitimate argument that Defendants' continued use of the domain name "LevinsonAxelrod.net," a domain name that is virtually identical to that of Plaintiff's, "LevinsonAxelrod.com," and Defendants' egregious conduct on the website in revealing client confidences and confidential and proprietary information of the firm, has caused, and, will, if not restrained, continue to cause, "loss of control of reputation, loss of trade, and loss of good will." Opticians Ass'n, supra, at 195.  Money damages cannot salvage or recover Plaintiff's good name and standing or otherwise adequately redress Plaintiff's loss.

In Shields v. Zuccarini, 254 F.3d 476 (3rd Cir. 2001), a case also involving claims of cyber-squatting, the Court of Appeals for the Third Circuit affirmed the District Court's finding of irreparable injury sufficient to justify both a preliminary injunction and a permanent injunction, where the defendant registered domain names that were intentional misspellings of the plaintiff's domain name. Initially, the defendant's websites featured advertisements for other sites and for credit card companies. Id. at 480. On the eve of the court hearing defendant attempted to transform the site into, what the defendant characterized as, a "political protest" in which he criticized the plaintiff's product. Id. The Court of Appeals affirmed the preliminary injunction which required that the defendant "transfer the infringing domains names to Shields and to refrain from 'using or abetting the use of' the infringing domain names or any other domain names

substantially similar to Shield's marks." Id. at 481. The court also affirmed the permanent injunction, stating:

> [t]he district court determined that Shields will **suffer damage to his reputation and a loss of goodwill** if Zuccarini is allowed to operate his offending web sites. **Shields's livelihood and fame depend, in large part, on Internet users being able to access his sites, and he does not want his audience trapped in Zuccarini's sites or put off by images displayed thereon which they may attribute to him.** The district court properly determined that **Shields would be irreparably harmed if the court did not grant the permanent injunction.** Id. at 486 (emphasis added). [1]

Defendants' postings, attacking, as they do, the professionalism of the firm attorneys; creating the false impression that the firm loses all or most of its cases; misrepresenting facts; disparaging the firm, it's practices, procedures and attorneys deceives the public to the extent that those viewing this material, if believed, would not want to retain the firm or have it continue representation. Even if Plaintiff is successful in ultimately obtaining a monetary judgment against Defendants, if this Court does not award a TRO, that judgment will be a hollow victory. Once the goodwill and public trust in Plaintiff's law firm, the lifeblood of any law firm, are destroyed, no transfusion by way of a monetary award will ever restore its health.

**B. Plaintiff has shown a reasonable probability of success on the merits.**

*1. Cyber-squatting*

Cyber-Squatting is defined as the "deliberate, bad-faith and abusive registration of Internet domain names in violation of the rights of trademark owners." Virtual Works, Inc. v. Volkswagen of Am., Inc., 238 F.3d 264, 267 (4th Cir. 2001). In order to prevent such occurrences and protect innocent domain users, the Anticybersquatting Consumer Protection Act (hereinafter, "ACPA")

---

[1] Courts have also held that irreparable injury can be based on the finding of a likelihood of confusion and/or damage to reputation, in trademark infringement/unfair competition cases. See, Opticians Ass'n v. Indep. Opticians, 920 F.2d 187 (3rd Cir. 1990) and Vista India v. Raaga, LLC, 501 F. Supp. 2d 605 (D.N.J. 2007).

was enacted on November 29, 1999. The ACPA makes it "illegal for a person to register or to use with the 'bad faith' intent to profit from an Internet domain name that is 'identical or confusingly similar' to the distinctive or famous trademark or Internet domain name of another person or company." Shields, supra, at 481, (citing 15 U.S.C. § 1125(d)). In order to prevail on an ACPA claim, a plaintiff must thereby establish that (1) it's marks are distinctive or famous; (2) the defendant's domain names are identical or confusingly similar to the plaintiff's marks; and (3) the defendant registered its domain name with the bad faith intent to profit from them. Shields, supra, at 483-84.

*i. Plaintiff's mark is distinctive or famous*

In determining whether "Levinson Axelrod" is a distinctive or famous mark a court must evaluate the following factors:

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties.

Shields, supra, at 482 (citing 15 U.S.C. 1125(c)(1)).

To the best of Plaintiff's knowledge, Plaintiff is the only "Levinson Axelrod" law firm in New Jersey, and indeed, in the nation. Grayzel Cert., Paragraph 15. "This suggests both the inherent and acquired distinctiveness" of such a name. Id. Additionally, Plaintiff has used the firm name Levinson Axelrod, P.A. and the domain name LevinsonAxelrod.com for

approximately 11 years. Grayzel Cert., Paragraphs 16 and 19. The longevity of Plaintiff's use suggests that the "Levinson Axelrod" name has acquired fame in the marketplace. Id. at 483. Levinson Axelrod, P.A. was featured in SuperLawyers, a publication with a circulation of approximately 13 million, and has been the subject of numerous articles in many different publications. Grayzel Cert., Paragraph 17. The law firm is listed in the yellow pages under "Levinson Axelrod, P.A." Grayzel Cert., Paragraph 17. Further, Plaintiff has expended significant monies publicizing its firm and services in various forms of broadcast media. Grayzel Cert., Paragraph 17. The "Levinson Axelrod" name has, by virtue of this extensive development of this brand, garnered significant, public trust and good will due to Plaintiff's hard work, success and significant monetary investment through the years. LevinsonAxelrod.com generates wide publicity giving it a global reach. Grayzel Cert., Paragraph 18. Word-of-mouth also generates considerable interest in the website by potential clients. Grayzel Cert., Paragraph 18. In light of the foregoing, it is evident that "Levinson Axelrod" is distinctive and the website, LevinsonAxelrod.com qualifies as famous.

ii.     *Defendants' domain name is confusingly similar to Plaintiff's*

It takes little imagination to conclude that the domain names "LevinsonAxelrod.com" and "LevinsonAxelrod.net" are confusingly similar. Indeed, that determination is patently obvious.

In Shields, supra, the court held that the domain names, joescartoon.com, joecarton.com, joescartons.com, joescartoons.com and cartoonjoe.com, were confusingly similar to the plaintiff's domain name, joescartoon.com. Id. at 483. Like the conduct in Shields, Defendants' conduct here, is a classic example of a specific practice that the ACPA was designed to prohibit. Id. at 484. The domain name "LevinsonAxelrod.net" is virtually identical to "LevinsonAxelrod.com." Clearly, Defendants chose to use a well-known mark to prey on consumer confusion by misusing the

domain name to divert customers from the Plaintiff's site to his own site. Id. Defendants'

obviously selected the domain name in anticipation that consumers would make a mistake,

thereby increasing the number of hits the site would receive. Id.

Any assertion that there was no intention to create the confusion between the websites is

dispelled by the fact that Defendant Heyburn has clearly taken affirmative steps to create

confusion in the mind of a person seeking to access to the Levinson Axelrod law firm website.

Specifically, a "Google" search of the name "Levinson Axelrod" conducted on November 4, 2009

displays, as the fifth result, the following:

### **Levinson Axelrod's** New Site | **Levinson Axelrod** Sucks
**Levinson Axelrod's** Official Site is back up and running. I encourage you to look
at their site and judge for yourself. Should a law firm be allowed to ...
**levinsonaxelrod**.net/?page_id=124 - Cached - Similar

Cafferty Cert., Paragraph 2, Exhibit A. The language that appears in this search result is

derived from the title tag in the source code for the website which is determined, not by Google,

but ultimately by the owner/designer of the website, i.e. Defendant Heyburn. Cafferty Cert,

Paragraph 3, Exhibit B, website source code/title tag. There is no doubt that Defendant Heyburn

has intentionally created a website and manipulated its domain name and title tag in a patently

obvious attempt to prey on consumer confusion caused by his deliberate actions.

> iii.    *Defendants chose the domain name with the bad faith intent to*
> *profit from its use*

15 U.S.C. §1125(d)(1)(B)(i) sets forth a non-exhaustive list of factors the court may

consider in determining whether a person has a bad faith intent to profit from the mark:

> (I) the trademark or other intellectual property rights of the person, if any, in the
> domain name; (II) the extent to which the domain name consists of the legal
> name of the person or a name that is otherwise commonly used to identify that
> person; (III) the person's prior use, if any, of the domain name in connection with
> the bona fide offering of any goods or services; (IV) the person's bona fide
> noncommercial or fair use of the mark in a site accessible under the domain

name; (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

As was the case in <u>Shields</u>, the conduct of Defendants in this case satisfies many, if not most, of the foregoing factors, clearly evidencing Defendants' bad faith intent to profit from the LevinsonAxelrod mark. <u>Shields</u>, <u>supra</u>, 485.

Specifically, Defendants have never used "LevinsonAxelrod" as a trademark or servicemark, and thus, have no intellectual property rights in that domain name; the domain name neither contains a variation of the legal name(s) of Defendants, nor any other name commonly used to identify them; Defendants have never used the infringing domain names in connection with the bona fide offering of goods or services; Defendants do not use the domain name for a non-commercial or "fair use" purpose; rather, Defendants deliberately maintain the domain name, LevinsonAxelrod.net, in a transparent scheme to divert clients from Plaintiff's website. <u>Id</u>. "In so doing, [they] harm the goodwill associated with the mark. [They do] this either for commercial gain, or with the intent to tarnish or disparage [Plaintiff]'s mark by creating a likelihood of confusion. <u>Id</u>. Finally, as noted herein, the mark, "Levinson Axelrod" is

distinctive and famous as to Plaintiff and Defendants' actions are an attempt to dilute or blur that mark.

A Court must "carefully examine the entire record, to ascertain the context surrounding the formation and use of the disputed domain name, and to scrutinize the defendant's actions for any evidence that the griping may in fact be a pretext disguising an underlying profit motive." Mayflower Transit, L.L.C. v. Prince, 314 F. Supp.2d 362, 372 (D.N.J. 2004). An examination of the record in this case makes it clear that Defendants' website is but one weapon in an arsenal used to damage and divert Plaintiff's business to Defendants. Indeed, this current assault upon Plaintiff is but the latest in Defendants' ongoing attempt to harm Plaintiff, which began even before Defendant Heyburn was terminated from Plaintiff's firm. Defendant Heyburn's termination occurred after Plaintiff discovered that Defendant was preparing to leave the firm and was utilizing Plaintiff's client lists and information to solicit firm clients to leave the firm with Defendant Heyburn. Grayzel Cert., Paragraph 3. Heyburn also encouraged and solicited at least one other employee of Plaintiffs law firm to leave the firm with Defendant. Grayzel Cert., Paragraph 3.

Defendants' website is not simply a website on which Defendants complain about Plaintiff's business. Rather, on that website, they encourage current and potential future clients of Plaintiff to fire, or not retain, the firm and hire Heyburn as their attorney and suggest to certain former clients and employees of Plaintiff (whom they describe in great detail) that if they retain Defendants, they can initiate and successfully prosecute an action against Plaintiff. For example Defendants state:

> I [Heyburn] represented a client from 1999 to 2004 when the matter was tried. Ron was assigned to oversee me and met with the client on a few occasions. Ron had little to do with the day to day handling of the case but wanted status updates. I always knew when he wanted the update. He said, "So what's going

on with your fat slob." Interestingly when I tried the matter, the jury returned a verdict of $1.4 Million with interest. The case went up on appeal and I started my own office. There was a battle for who would handle the case thereafter. The client told me he met with Ron and believed that "Levinson Axelrod" had the big guns to handle the case on appeal.

I didn't have the heart to tell the client that the man he put his trust in called him a big fat slob for the past 5 years. Interestingly, the client contacted me a year later and asked me to review Levinson Axelrod's closing paperwork. Ron had settled the case waiving most of the client's pre-judgment interest. When I looked at the paperwork it was clear that Ron had overcharged him $17,000. It is one thing to insult someone but to overcharge them too? I got the client back his money. Levinson Axelrod could not write a check fast enough.

Furthermore, Defendant Heyburn directs readers to contact him at his law firm with questions and comments when he states in the audio clip featured on the website, "I hope you enjoy and if you have any questions or comments feel free to send them to me at www.heyburnlaw.com." Grayzel Cert., Paragraph 9.

Defendants also include on the website the statement, "File an ethics complaint against Levinson Axelrod" under a hyper-link to an Attorney Ethics Grievance Form under the heading "File a Complaint against Levinson Axelrod," adding further fuel to Defendants' toxic fire of false innuendos regarding Plaintiff's purported lack of competence and ethics – all of which have been carefully and deliberately crafted to encourage clients to leave Levinson Axelrod and retain Defendants in its stead. Grayzel Cert., Paragraph 8.

### 2. Trademark Infringement and Unfair Competition under N.J.S.A. 56:4-1 and 15 U.S.C. 1125(a)(1)

The New Jersey Fair Trade Act states that "no merchant, firm or corporation shall appropriate for his or their own use a name, brand, trade-mark, reputation or goodwill of any maker in whose product, such merchant, firm or corporation deals." N.J.S.A. § 56:4-1. The Act was enacted in order "to protect the good will inherent in trademark brand from reduction in value by uneconomic practices." Cooper Distributing Co., Inc. v. Arnco Electronics, 131 N.J.

Super. 52, 57 (App. Div. 1975). N.J.S.A. 56:4-1 is the state statutory equivalent of section 43(a)(1) [15 U.S.C. 1125(a)(1) as amended] of the Lanham Act and violation of section 43(a)(1) of the Lanham Act leads to a finding of liability under N.J.S.A. 56:4-1. FM 103.1, Inc. v. Universal Broadcasting of New York, Inc., 929 F.Supp. 187, 198 (D.N.J. 1996).

Pursuant to the Lanham Act, 15 U.S.C. 1125(a)(1):

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

\* \* \*

N.J.S.A. 56:4-1 and 15 U.S.C. 1125(a)(1) provide state and federal protection from Defendants' infringement of Plaintiff's trademark, as well as, Defendant's unfair competition practices.

*i.      Trademark Infringement*

The Lanham Act not only protects registered trademarks, but also "extends protection to unregistered trademarks on the principle that unlicensed use of a designation serving the function of a registered mark constitutes a false designation of origin and a false description or representation." A.J. Canfield Co. v. Honickman, 808 F.2d 291, 296 (3rd Cir. 1986). "Under the Lanham Act, service marks, which are used to identify the source of services, are entitled to the same legal protection as trademarks, which are used to identify the source of goods." Dranoff-Perlstein Associates v. Sklar, 967 F.2d 852, 855 (3rd Cir. 1992).

In analyzing whether a mark is protected, courts have identified four categories of marks, based on their levels of distinctiveness: (1) ***arbitrary terms***, which bear no logical or suggestive

relation to the actual characteristics of a good (KODAK); (2) *suggestive terms*, which suggest the characteristics of a good (COPPERTONE); (3) *descriptive terms*, which describe a characteristic or ingredient of a good (SECURITY CENTER); and (4) *generic terms*, which function as the common descriptive name of a product class (DIET CHOCOLATE FUDGE SODA). Dranoff, supra, at 855 and 857 and A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 221 (3rd Cir. 2000) (emphasis added). If the mark is arbitrary or suggestive, it is treated as distinctive and automatically qualifies for trademark protection, at least in the geographic and product areas in which the senior user applies it to goods. Dranoff, supra, at 855. If the mark is descriptive, it qualifies for trademark protection if the claimant proves that consumers identify the term with the claimant; in other words, that the term has a secondary meaning. Id.

The name, "Levinson Axelrod" is arbitrary, in that it bears no relation to the actual services performed by the professional association. A consumer would have to research Levinson Axelrod to discover that it is a law firm. Therefore, as an arbitrary mark it is distinctive and the name automatically qualifies for trademark protection. Unmistakable is the fact that there is a likelihood of confusion between Plaintiff's name and Defendants' use of the name "Levinson Axelrod" in its domain name and on its website.

> Likelihood of confusion exists "'when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.'" "'Proof of actual confusion is not necessary; likelihood is all that need be shown.'" As we stated in *Ford Motor Co.*, the likelihood of confusion analysis requires the evaluation of a number of factors, including:
>
> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of owner's mark; (3) the price of the goods [or services] and other factors indicative of the care and attention ejected of consumers when making a purchase; (4) the length of time defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods [or services], though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the

parties' sale efforts are the same; (9) the relationship of the goods [or services] in the minds of the public because of the similarity of function . . .

Id. at 862-63 (internal citations omitted).

Here, Defendants' use of "Levinson Axelrod" in its domain name, LevinsonAxelrod.net, is identical to Plaintiff's use in its domain name, LevinsonAxelrod.com. Furthermore, Defendants' use of that name as the heading and the footer on their website is similar to Plaintiff's use of its name as a heading on its own firm website. As mentioned above, Plaintiff has used "Levinson Axelrod" to describe its law firm for 11 years. Grayzel Cert., Paragraph 19. The firm has expended time, money and effort into developing and maintaining the brand that the name represents. Grayzel Cert., Paragraph 19. The public immediately equates "Levinson Axelrod" with Plaintiff's law firm and associates a value to that name. By using that name in their domain name and on their website, Defendants intentionally create confusion as to the origin of their website. They deliberately mislead the public into thinking that "LevinsonAxelrod.net" is a website originated by Plaintiff and containing information about, and relevant to, Plaintiff.

### ii. *Unfair Competition*

To state a claim for unfair competition, a plaintiff must demonstrate the following:

1) that the defendant has made false or misleading statements as to his own product [or another's];

2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience;

3) that the deception is material in that it is likely to influence purchasing decisions;

4) that the advertised goods travelled in interstate commerce; and

5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

Ditri v. Coldwell Banker Residential Affiliates, 954 F.2d 869, 872 (3rd Cir. 1992).

Once the elements of a claim for Unfair Competition are satisfied, not only does the Act

protect a Plaintiff from Defendants' misrepresentations of fact, but also a Plaintiff is protected from ambiguity and false or misleading implication and innuendo. Vidal Sassoon, Inc. v. Bristol-Myers Co., 661 F.2d 272, 276-78 (2nd Cir. 1981).

Here, Plaintiff has unquestionably satisfied all five elements of its Unfair Competition claim. On their website, Defendants attack Plaintiff by creating the false impression that the attorneys of Levinson Axelrod are unprofessional and ineffective. Furthermore, Defendants mislead the reader by implying that Plaintiff's law firm loses all or most of its cases, misrepresent facts, deceive and disparage the firm's practices, procedures, attorneys and business. Defendants lure Internet users to their website by using a domain name that is almost identical to the one used by Plaintiff. Not only is the tendency of Defendants' website to deceive the audience plainly evident, but Defendants are, in fact, intentionally deceptive and prey on audience confusion, so that they can divert Internet users to their website. Defendants' conduct has, and will continue to, destroy Plaintiff's business and divert current and potentially future clients to Defendants.

Furthermore, the Defendants' website involves interstate commerce, as it is posted on the World Wide Web.

> The Third Circuit has concluded that the Internet is a channel and instrumentality of commerce. "Because of the very interstate nature of the Internet, once a user submits a connection request to a website server or an image is transmitted from the website server back to user, the data has traveled in interstate commerce." Zinn v. Seruga, No. 05-cv-3572, 2006 U.S. Dist. LEXIS 51773, at 32 (D.N.J. July 28, 2006).

Finally, Defendants' conduct has, and will continue to, injure Plaintiff's goodwill, reputation and trade. Plaintiff is likely to suffer a decline in clientele and to lose standing in the community as a reputable law firm.

### 3.  *Breach of Duty of Loyalty*

In New Jersey, "the duty of loyalty includes a duty of confidentiality which requires

employees not to disclose the employer's confidential and proprietary business information during or after the employment has ended." See Fox v. Goz (In re Target Indus., Inc.), No. 99-43997, 2008 Bankr. LEXIS 2775 at 81-82 (Bankr. D.N.J. Aug. 28, 2008); see also Sun Dial Corp. v. Rideout, 16 N.J. 252 (1954). Moreover, the duty to be faithful does not cease when the employment ends. Bull v. LogEtronics, Inc., 323 F. Supp. 115, 133 (E.D. Va. 1971). The employee has a duty not to reveal confidential information obtained through his employment, and not to use such confidential information after he has left his employment. Id.

Here, Defendant Heyburn has breached this duty of loyalty to Plaintiff by disclosing on Defendants' website, certain confidential and proprietary information of Plaintiff including, but not limited to, confidential communications between firm clients and firm attorneys and personal client information, in violation of R.P.C. 1.6. He has further breached this duty of loyalty by engaging in fraud, misrepresentation and dishonest and deceitful conduct, including, but not limited to, cyber-squatting, trademark infringement, and unfair competition, in violation of R.P.C. 8.4. Defendant Heyburn has also breached that duty by engaging in unethical advertising, in violation of R.P.C. 7.1 and 7.2.

R.P.C. 1.6 states, in relevant part:

(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraphs (b), (c), and (d).

R.P.C. 8.4, in relevant part, defines professional misconduct:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another

* * *

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

* * *

By disclosing on Defendants' website confidential communications between firm clients and firm attorneys and setting forth sufficient facts that make the clients identifiable, Defendant Heyburn is contravening R.P.C. 1.6. By engaging in cybersquatting, trademark infringement and unfair competition, in an effort to damage Plaintiff's business and divert clients to Defendants' law firm, Defendant Heyburn is contravening R.P.C. 8.4.

Furthermore, Defendant Heyburn has breached his duty of loyalty by portraying on his website the Plaintiff's firm, during his tenure, in an inaccurate manner which discredits the Plaintiff's firm and the entire legal profession by using extreme methods in portraying counsel and the legal system in an absurd light, in violation of the R.P.C.s.

R.P.C. 7.1 directs, in relevant part, "a lawyer shall not make false or misleading communications about the lawyer, the lawyer's services, or any matter in which the lawyer has or seeks a professional involvement." Communication that "compares the lawyer's services with other lawyers' services," is false and misleading. R.P.C. 7.1. Here, Defendant Heyburn compares his "successes" against the alleged failures of Plaintiff. He bombards the audience with negative stories and comments about Plaintiff's law firm while failing to mention Plaintiff's accomplishments, leaving the audience with the overall impression that Plaintiff's firm is unprofessional and loses most, if not all, of its cases. Defendant Heyburn then uses the website as a forum to promote his law firm and tout its accomplishments. The R.P.C.s prohibit such an advertising scheme, as it misleads, rather than informs, the public. See R.P.C. 7.1.

Defendants' website is also contrary to R.P.C. 7.2, which states, in relevant part:

All advertisements shall be predominantly informational. No drawings, animations, dramatizations, music, or lyrics shall be used in connection with

televised advertising. No advertisement shall rely in any way on techniques to obtain attention that depend upon absurdity and that demonstrate a clear and intentional lack of relevance to the selection of counsel; included in this category are all advertisements that contain any extreme portrayal of counsel exhibiting characteristics clearly unrelated to legal competence.

Here, Defendants' website, which has the dual purpose of belittling Levinson Axelrod, P.A., while promoting Defendant Heyburn's law firm, is not "predominantly informational," as it contains little factual information about his law firm. Defendant Heyburn does not list a telephone number or address for his law firm. He does not tell the reader the types of law he practices or the services he provides. Rather, he speaks in general terms about his purported accomplishments while disparaging Plaintiff's law firm. In short, rather than being "predominantly informational," the website is Defendant Heyburn's fictional account of his prowess as a lawyer as compared to Levinson Axelrod, P.A.

Defendant Heyburn displays drawings and quotations on his website. For example, the backgrounds of his website have consisted of images of warriors and gods as well as images of a dark and gloomy lake. He has also posted various quotations on his website:

> The individual has always had to struggle to keep from being overwhelmed by the tribe. If you try it, you...

> He who fights with monsters should be careful lest he thereby become a monster. And if thou gaze long into an abyss, the abyss will also gaze into thee.

See Exhibits to Paragraph 10 of Grayzel Cert.

In addition to these postings, Defendant Heyburn also states in an audio clip, that his website is "dedicated to all the working class people that get stepped on by their rich bosses." See Exhibits to Paragraph 10 of Grayzel Cert. Clearly, these displays, quotations and other techniques lack relevance to the selection of an attorney and are included for the purpose of obtaining attention and appealing to the emotions of readers. This website is a cleverly crafted attack on

Plaintiff that is meant to mislead the public by focusing not on the legal competency of Defendant Heyburn but on his distorted version of the Plaintiff's law firm.

Defendant Heyburn goes so far as to criticize the physical appearance of various attorneys at Plaintiff's law firm. By way of example, and not limitation, he personally attacks various attorneys of Plaintiff's law firm, stating, "[w]hat is up with all the 1970's porno mustaches? Can anyone figure out what happened to Wheaton's neck? He is starting to look like an old woman," and "I have seen Ron time and again. He looks like death." See Exhibits to Paragraph 10 of Grayzel Cert. Defendant Heyburn also attacks another attorney at Plaintiff's firm, stating, "Adam Rothenberg - A man without friends." See Exhibits to Paragraph 10 of Grayzel Cert. In so doing, the website clearly relies "on techniques to obtain attention that depend upon absurdity and that demonstrate a clear and intentional lack of relevance to the selection of counsel." The website is meant to mislead the reader into the impression that Plaintiff's law firm is unprofessional and unsuccessful. Defendants attempt to do this by posting articles purporting to be the "truth behind the lies" at Levinson Axelrod, P.A. Those articles are meant to appeal to the reader's emotions, rather than provide the audience with accurate and informative facts about Defendant's law firm.

Each of these actions constitutes, in turn, not only a violation of the R.P.C.s, but also, in so violating the R.P.C.s, a violation of his duty of loyalty to his former employer – a duty which clearly casts upon any attorney the obligation to abide by the R.P.C.s during his tenure of employment and even after that tenure has ended, when he chooses to act or speak about that tenure.

**C. The harm to Plaintiff if the injunction is not issued is greater than the harm to Defendant if the injunction is issued.**

Over the course of many years, Plaintiff has invested significant money, time, and hard work, in developing its law firm. It has earned the public's trust and goodwill and has established

itself as a reputable and competent law firm. The brand that Plaintiff has created, however, is under attack by the deceptive and illegal acts of Defendants. The harm to Plaintiff, if Defendants are allowed to continue the use of their website, is a complete loss of its reputation and standing in the eyes of the public and clients.

These serious consequences far outweigh any harm Defendants may claim as a result of the entry of a TRO. If a TRO is granted, Defendant Heyburn will still be able to fully and fairly operate his law firm. He will still have the opportunity to notify individuals of the claims he believes they may have. He will still be able to speak his mind on various legal issues. What he will not be able to do, is mislead and deceive a member of the public into believing he/she is navigating to a website of Plaintiff's when, in reality, that member of the public is being led to a website, masquerading as that of Plaintiff, while at the same time touting Defendants' law firm. Defendants' ability to compete with Plaintiff will not be affected by the issuance of a TRO, Defendants just will not be able to do so by illegal means.

**D.    The interest of public policy supports the issuance of the injunction.**

Defendants deliberately selected a domain name that is almost identical to Plaintiff's, in an effort to divert business away from Plaintiff. Indeed, the transcription of the audio sound bite on the October 29, 2009 version of Defendants' website, unabashedly does just that. Defendants are relying on the fact that Internet users will mistakenly type "LevinsonAxelrod.net," rather than "LevinsonAxelrod.com," or mistakenly believe that "LevinsonAxelrod.net" is affiliated with Plaintiff's law firm. Indeed, Defendants' use of "Levinson Axelrod's New Site" in the title tag/source code for their website makes Defendants' intent to mislead the public plainly obvious. Defendants are also seeking to profit from this confusion, in that current and potential future clients may be unknowingly lured to Defendants' website where they are bombarded with false

and negative articles and confidential and proprietary information of Plaintiff, accompanied by purported success stories of Defendant Heyburn and his law firm. Public policy is evidenced by the numerous statutory and judicial decisions cited herein which abhor such conduct by rendering it illegal.

This is a case where the grant of a TRO is clearly in the public interest, as Defendants are in the business of profiting from the public's confusion. See Shields, supra, at 484. The public has a right to not be deceived by competitors of Plaintiff and should be able to browse for products and services on the Internet without being diverted to unintended websites. It is in the public's interest to restrain Defendants from maintaining their website, LevinsonAxelrod.net.

## Conclusion

For the foregoing reasons, Plaintiff respectfully requests that this Court grant its application for a temporary restraining order, enjoining and restraining defendants, Edward Harrington Heyburn and the Law Offices of Edward Harrington Heyburn, a professional corporation, individually or in concert with any agent, servant, employee or other person or entity, from: (1) utilizing, posting, operating, or otherwise maintaining the domain name or subdomain of "LevinsonAxelrod" or any name confusingly similar thereto; and (2) revealing confidential and proprietary communications and information including, but not limited to, those relating to confidential communications between firm clients and firm attorneys, personal client information and client lists, inner workings of the law firm's business, including the manner in which client conferences are conducted, firm cases are distributed, case loads are maintained and supervised, cases are evaluated by the firm, liability and damages of individual clients are analyzed and assessed, and cases are settled; (3) portraying on their website the Plaintiff's law

firm in any manner which is contrary to the Rules of Professional Conduct; and (4) granting such other relief as the court deems equitable and just.

DATED: November 4, 2009

THOMAS J. CAFFERTY, ESQ.

NOMI I. LOWY, ESQ.

LAUREN E. JAMES, ESQ.