# SCARINCI HOLLENBECK

Lyndhurst | Freehold | New York

THOMAS J. CAFFERTY, Partner
tcafferty@scarincihollenbeck.com
Direct Phone: 201-623-1221   Direct Fax: 201-806-3502

December 18, 2009

**ELECTRONICALLY FILED**
Hon. Anne E. Thompson
United States District Court, District of New Jersey Trenton
Clarkson S. Fisher Federal Bldg. & U.S. Courthouse, Room 4000
402 E. State Street
Trenton, NJ 08608

Re:   LEVINSON AXELROD, P.A. v. EDWARD HEYBURN, PC and THE LAW OFFICES OF EDWARD HARRINGTON HEYBURN, a Professional Corporation
Civil Action No: 3:09-cv-05627 (FLW-LHG)

Dear Judge Thompson:

As you are aware, this law firm represents Plaintiff Levinson Axelrod in this matter. On December 16, 2009 Defendants submitted the Certification of Defendant Edward Heyburn in Opposition to Plaintiff's Request for Temporary Restraints currently returnable on Tuesday December 22, 2009. Please accept this letter in response to the assertions made in that Certification.

First, Plaintiff respectfully requests that this Court disregard Paragraphs 43 through the second numbered paragraph 45 at the end of the Certification (note that the paragraphs are numbered incorrectly in the Certification, as Mr. Heyburn has included two sets of paragraphs numbered 44 and 45), as those paragraphs contain improper legal argument and summation. By way of example, Defendant Heyburn's Certification provides:

> 43.   There is a heavy presumption that any prior restraint on publication of information or ideas is constitutionally invalid. This doctrine has been firmly established for 60 years, since the U.S. Supreme Court decided *Near v. Minnesota*, 283 U.S. 697 (1931).
>
> 44.   The Lanham Act, the Anti-cybersquatting Act and the common law unfair trade practices only apply to commercial speech where the speaker has a commercial purpose.

Clearly, these paragraphs constitute legal argument and summation. Local Rule 7.2(a) provides, in pertinent part:

{00533681.DOC}

Scarinci & Hollenbeck, LLC   1100 Valley Brook Avenue, P.O. Box 790, Lyndhurst, NJ 07071-0790   Phone: 201-896-4100   Fax: 201-896-8660   www.scarincihollenbeck.com

> ...Argument of the facts and the law shall not be contained in affidavits. Legal arguments and summations in affidavits ***will be disregarded by the Court*** and may subject the affiant to appropriate censure, sanctions or both.

(emphasis added). As such, the paragraphs containing such legal arguments and summations must be disregarded.

Second, Defendant Heyburn's Certification implies that there is a legal requirement that Defendants make a profit from the website in order to satisfy the "commercial use" element of the Lanham Act. Specifically, paragraphs 39, 41 and 42 of Defendant Heyburn's Certification provide:

> 39. Plaintiff's supplemental pleadings have identified posts and my opinion on whether posters have a legal right to make such posts. Despite the fact that there is no charge or commercial transaction associated with these posts, the Plaintiff seeks remedy under the Lanham Act and the Anti-cybersquatting Act.

> 41. Although the Plaintiff says their trademark has been infringed upon and their reputation has been harmed; (sic) it is unable to set forth a single case or client it lost as a result of my website.

> 42. Plaintiff is also unable to set forth a way that they (sic) website has established a commercial purpose making the site commercial speech which may fall under the Lanhan (sic) Act and/or the Anti-cybersquatting Act.

The "commercial use" element under the Lanham Act does not require a defendant to make a profit from its use of another's trademark. Rather, defendant's use of a trademark qualifies as "commercial" when it is designed to harm the plaintiff commercially by disparaging it and preventing the plaintiff from benefiting from the use of its own trademark. See Jews For Jesus v. Brodsky, 993 F. Supp. 282, 308 (D.N.J. 1998), see also, Trade Media Holdings Ltd. V. Huang & Assocs., 123 F. Supp. 2d. 233, 242 (D.N.J. 2000)(Using a domain name to operate a website is a "use in commerce" because it affects a plaintiff's ability to offer services) and Planned Parenthood Fed'n of Am. v. Bucci, 1997 U.S. Dist. LEXIS 3338 (S.D.N.Y. Mar. 24, 1997)(noting that establishment of a typical home page on the Internet satisfies Lanham Act's "in commerce" requirement).

In Jews For Jesus, the United States District Court of New Jersey granted the plaintiff a preliminary injunction where the defendant deliberately diverted Internet users to his website by using the plaintiff's trademark as a domain name for a website that the defendant characterized as "an educational counterpoint against [the Plaintiff Organization's] lies." Jews For Jesus, supra, at 288, 291. In that case, the plaintiff established an Internet website with the domain name "jews-for-jesus.org," containing information about the mission and message of the Plaintiff Organization. Id. at 290. Subsequently, the defendant, an attorney and vocal opponent of plaintiff's mission, teachings, message and services, created an Internet website with the domain name, "jewsforjesus.org." Id. The defendant's website contained a hyperlink to the website for the

Outreach Judaism Organization, which was also a vocal opponent of the views espoused by the plaintiff. Id. at 291. The defendant stated that the plaintiff's organization "rubs [him] the wrong way" and that the intent behind his "bogus 'Jews for Jesus' site is to intercept potential converts before they have a chance to see the obscene garbage on the real [Jews for Jesus] site." Id. at 291.

In outlining the elements of the plaintiff's causes of action under the Lanham Act and New Jersey Statutes, the court stated:

> In this case, the use by the Defendant in his domain name of the Mark and the Name of the Plaintiff Organization has resulted in not only the loss of control over the Mark and the Name of the Plaintiff Organization, but also in the reality that views directly contrary to those of the Plaintiff Organization will be disseminated through the unauthorized use of the Mark and the Name of the Plaintiff Organization. As such, irreparable harm has resulted
>
>> because [the use of the Mark and the Name of the Plaintiff Organization] is likely to prevent some Internet users from reaching plaintiff's own Internet web site. Prospective users of plaintiff's services who mistakenly access defendant's web site may fail to continue to search for plaintiff's own home page, due to anger, frustration or the belief that plaintiff's home page does not exist. Id. at 307 (internal citations omitted).

The court specifically focused on the commercial use requirement of the Lanham Act and New Jersey statutes, stating:

> In this case, the Defendant has done more than merely register a domain name. He has created, in his words, a "bogus 'Jews for Jesus'" site intended to intercept, through the use of deceit and trickery, the audience sought by the Plaintiff Organization. Moreover, the Defendant Internet site uses the Mark and the Name of the Plaintiff Organization as its address, conveying the impression to Internet users that the Plaintiff Organization is the sponsor of the Defendant Internet site. Id. at 308.

The court presented two independent reasons why the defendant's website constituted commercial use in connection with goods and/or services. First, the court found that because the defendant hyperlinked his website to the website of Outreach Judaism Organization, which advertised the sale of certain merchandise, the defendant's website acted as a conduit to the Outreach Judaism Organization. Id. at 308. Separate from that reason, the court found that:

> [t]he conduct of the Defendant also constitutes a commercial use of the Mark and the Name of the Plaintiff Organization because it is designed to harm the Plaintiff Organization commercially by disparaging it and preventing the Plaintiff Organization from exploiting the Mark and the Name of the Plaintiff Organization. See Panvision, 945 F. Supp. at 1303. In addition, the Defendant Internet site has

and will continue to inhibit the efforts of Internet users to locate the Plaintiff Organization Internet site. Id. at 308.

See also, Trade Media Holdings Ltd. V. Huang & Assocs., 123 F. Supp. 2d. 233, 242 (D.N.J. 2000)(Using a domain name to operate a website is a "use in commerce" because it affects a plaintiff's ability to offer services) and Planned Parenthood Fed'n of Am. v. Bucci, 1997 U.S. Dist. LEXIS 3338 (S.D.N.Y. Mar. 24, 1997)(noting that establishment of a typical home page on the Internet satisfies Lanham Act's "in commerce" requirement).

In analyzing plaintiff's claims under 15 U.S.C. 1125(a), the court held that the defendant's use of the plaintiff's mark was not only "in commerce," but was also "'in connection with goods and services' as that term is used in Section 1125(a)" because the use of the plaintiff's mark "is not only designed to, but is likely to, prevent some Internet users from reaching the Internet site of the Plaintiff Organization. Id. at 309.

> The requirement that the activities of an infringer be done "in connection with any goods or services," does not require the infringer to actually cause goods or services to be placed into the stream of commerce. See *Juno, 979 F. Supp. at 691* (finding mere acquisition of domain name constituted "in connection with goods and services"). Rather, all that is needed is that the trademark violation be "in connection" with any goods or services. Id. at 309.

See also, Dluhos v. Strasberg, No. 00-3163(JCL), 2005 U.S.Dist. LEXIS 34383 (D.N.J. June 23, 2005)(Use of a misleading domain name is "in connection" with goods and services where it impacts the business of another, who does sell goods or provide services).

***Defendants herein have used Plaintiff's name, "not as a commentary on its owner, but instead as a source identifier."*** See Cellco Partnership v. Communication Workers of America, No. 02-5542(MLC), 2003 U.S. Dist. LEXIS 26823 (D.N.J. Dec. 11, 2003)(Emphasis Added).

Here, it is evident that Defendants' intention in using Plaintiff's name as the domain name for their website is to mislead the viewer into believing that the origin of the website was Plaintiff's law firm. Verified Complaint, ¶ 8. Defendants' use of the phrase "Levinson Axelrod" to identify their website is likely to create confusion concerning the origin of the website and information, goods and/or services contained or described therein. Verified Complaint, ¶26. In fact,

> Defendants' website, when accessed on or about October 29, 2009, and on numerous days prior thereto, prominently displayed the name "Levinson Axelrod" at the top of the website. The name "Levinson Axelrod" was then repeated at the bottom of the website. On October 19, 2009, the copyright symbol "©" and year 2009 appeared before the firm name on the bottom of Defendants' website (i.e. "© 2009 Levinson Axelrod").

Verified Complaint, ¶ 8.

December 18, 2009
Page 5

Defendant Heyburn's intention here is clearly "to intercept, through deceit and trickery," the audience sought by plaintiff. See Jews For Jesus, supra at 308. Defendant Heyburn lures Plaintiff's potential clients to his website so that he may ambush them with what he calls "the truth behind the lies" in an effort to dissuade them from hiring Levinson Axelrod. As in Jews For Jesus, it is Defendant Heyburn's obvious intention that prospective clients mistakenly access his website, read the content thereon, and then cease looking for Plaintiff's real website due to a variety of motivations including anger, frustration, or the belief that Plaintiff's homepage does not exist. Id. at 307.

The commercial nature of Defendants' website is even more evident than that of the defendant's in Jews For Jesus. Here, Defendants' website not only disparages Plaintiff's law firm, but it also advertises Defendant Heyburn's competing law firm, gives legal advice and goes so far as to solicit business. By way of example and not limitation, Defendants encourage their viewers to "file an ethics complaint against Levinson Axelrod" and that they tell their viewers that "the designation of certain [Levinson Axelrod] members as 'Super Lawyers,' was not based on merit, but rather, purchased." Verified Complaint, ¶¶ 7, 10.

> Defendants' website, however, then proceeds to attack the professionalism of Plaintiff's firm attorneys and disparages the firm's practices, procedures, attorneys and business to the extent that those reading the material would not, if the material were believed, want to engage the firm or continue having the firm represent them in legal matters. Verified Complaint, ¶ 9.
>
> * * *
>
> Defendant Edward Harrington Heyburn ("Defendant Heyburn") has posted numerous comments on his website, LevinsonAxelrod.net, in which he informs viewers of the existence of his law firm, touts his alleged legal accomplishments and/or otherwise connects his law practice to his LevinsonAxelrod.net website. Declaration of Thomas J. Cafferty dated November 12, 2009, ¶ 3. See also Declaration of Thomas J. Cafferty dated November 20, 2009, ¶ 3.

Defendant Heyburn connects his law firm to LevinsonAxelrod.net by directing viewers to log onto his Levinson Axelrod Really Sucks Facebook Page where his contact information consists of his business e-mail address, Heyburn@heyburnlaw.com. See Declaration 1, ¶ 5. Additionally, Defendant Heyburn has linked his law firm to LevinsonAxelrod.net by posting on the website the letters -- printed on letterhead that prominently displays Defendant Heyburn's firm name, address, telephone number and fax number -- which he has written to opposing counsel and the Court. Declaration 1, ¶ 6.

Moreover, the audio component on Defendants' website invites the public to contact him with questions or comments at his business email address, www.Heyburnlaw.com. Verified Complaint, ¶ 7. Defendant Heyburn goes so far as to give a poster on his website legal advice, completely unrelated to Lexinson Axelrod, and invites that poster to contact him for further legal help. Declaration of Thomas J. Cafferty dated December 4, 2009, ¶ 3.

Defendant Heyburn is thus using his website as a forum not only to spew his hatred for Plaintiff in an attempt to harm Plaintiff's business, but also to build his client base and obtain business for his own law firm.

Unlike Trademark Infringement, Unfair Competition and Dilution, the Anti-cybersquatting Act includes the element of "bad faith intent to profit." However, this element does not require that a defendant intend to achieve a commercial gain from the existence of his website. 15 U.S.C. §1125(d)(1)(B)(i) sets forth a non-exhaustive list of factors the court may consider in determining whether a person has a bad faith intent to profit from the mark:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name; (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; *(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;* (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section. (Internal Citations Omitted) (Emphasis Added).

It is clear that of the relevant considerations as to whether there is a "bad faith intent to profit," factors IV and V bear directly on the question of commercial use as a component of the "bad faith intent to profit" element. As previously stated, Defendants' use of Plaintiff's name qualifies as "commercial use" under the Lanham Act and is not a "bona fide noncommercial or fair use" as set forth is factor IV above. Furthermore, factor V directs that the court examine whether, in this case, Defendants' intent is to divert customers from Plaintiff's website to Defendants' website, thereby harming the goodwill represented by the "Levinson Axelrod" name, either for commercial gain or with the intent to tarnish or disparage that name, by creating a likelihood of

confusion as to the source, sponsorship, affiliation, or endorsement of the site. As previously detailed in both our original Brief in Support of the Order to Show Cause and in this letter Plaintiff has clearly demonstrated that Defendants have not only operated the website in question for commercial gain, but also have unequivocally demonstrated Defendants' intent to tarnish or disparage the name "Levinson Axelrod" by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the website.

Respectfully yours,

*/s/ Thomas J. Cafferty*
THOMAS J. CAFFERTY

TJC:mlk
Enclosures

cc:  Edward Harrington Heyburn (via electronic filing)
     Ronald Grayzel, Esq. (via e-correspondence)